# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE, | : | **Civil Action No: 25-787** |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY; KIMBERLY MCKEOWN, | : | |
| AND GORDON SILVERSTEIN; | : | |
| *Defendants.* | : | May 15, 2025 |

## COMPLAINT

1.      This case concerns Yale University's refusal to provide a doctoral student with documented disabilities the reasonable accommodation of additional time to complete her dissertation - an accommodation explicitly permitted by Yale's own policies and granted to non-disabled students. Jane Doe, a candidate for the J.S.D (Doctor of the Science of Law) at Yale, suffers from [REDACTED]

When her disabilities prevented her from meeting an arbitrarily imposed set of deadlines to submit drafts of her dissertation, she requested an extension to May 2026. Yale denied this request despite its own published policies stating that doctoral candidates "demonstrating satisfactory academic progress may petition for an extension of candidacy past the fifth year" with no published maximum number of years a candidate may extend their registration for. Yale currently has at least two non-disabled students in the same J.S.D. program who have been enrolled substantially longer than Ms. Doe. Yale's Student Accessibility Services (SAS) twice denied her accommodation request without proper justification. First, Ms, Kimberly McKeown denied the request claiming as the only reasons for the denial, that "you have received multiple extensions" and "and your faculty supervisor has denied your request for an extension." When

Ms. Doe made use Yale University's official Section 504 grievance procedure by appealing the SAS decision to Yale's Section 504 Coordinator, Yale's Section 504 Coordinator directed SAS to reconsider its decision through an "interactive process," but SAS simply reframed its denial without any meaningful interaction with Ms. Doe. Throughout this process, Ms. Doe faced escalating threats of expulsion, arbitrary deadlines, and administrative interference that exacerbated her disabilities - all while requesting nothing more than the same flexibility Yale routinely grants to non-disabled students.

2.      Plaintiff Jane Doe brings this action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq., Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq., and Connecticut state law to remedy Defendants' discriminatory refusal to provide reasonable accommodations for her documented disabilities.

3.      Ms. Doe is a doctoral candidate in an advanced graduate degree program at Yale University with [REDACTED]

These disabilities have significantly impaired her ability to complete her dissertation on the timeline arbitrarily imposed upon her – a timeline not required by Yale's own published policies and not imposed on similarly situated non-disabled students.

4.      Ms. Doe has requested reasonable accommodations to extend her candidacy through the 2025-2026 academic year with a May 1, 2026 deadline for her dissertation submission. Despite ample documentation of her disabilities and their impact on her academic progress, and despite evidence that other students without disabilities have been permitted longer completion timelines, Yale has repeatedly denied her requests through a procedurally and substantively flawed process.

5. Yale's Student Accessibility Services ("SAS") has failed to engage in the interactive process required by law and Yale's internal policies, denied Ms. Doe's accommodation request without proper justification, and then, after being directed to reconsider by Yale's Office of Institutional Equity and Accessibility ("OIEA"), simply reframed its denial in conclusory terms without meaningful reconsideration. When directed to reconsider by OIEA a second time using the required interactive process, SAS again refused to use the required interactive process.

6. Ms. Doe seeks declaratory and injunctive relief to secure the reasonable accommodations to which she is entitled under federal law, as well as compensatory damages for the emotional distress, lost tuition, academic harm and reputational damage she has suffered as a result of Defendants' discriminatory conduct.

## I. Jurisdiction and Venue

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under federal law, specifically Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

8. This Court has supplemental jurisdiction over Ms. Doe's state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Yale University is located in this district, all parties reside in this district, and a substantial part of the events giving rise to this claim occurred in this district.

10. Plaintiff Jane Doe is a doctoral candidate in an advanced graduate degree program at Yale University and a resident of New Haven, Connecticut.

11.    Defendant Yale University is a private university that receives federal financial assistance and is subject to the requirements of Section 504 of the Rehabilitation Act. Yale University is also a place of public accommodation subject to Title III of the ADA. Yale University is located in New Haven, Connecticut.

12.    Defendant Kimberly McKeown is the Director of Student Accessibility Services at Yale University located in New Haven Connecticut.

13.    Defendant Gordon Silverstein is the Assistant Dean for Graduate Programs at Yale Law School located in New Haven Connecticut.

## II.    Facts Common to All Counts

### A.    Ms. Doe's Disabilities and Academic History

14.    Ms. Doe is diagnosed with the following disabilities: [REDACTED]

15.    Ms. Doe has submitted medical documentation of these disabilities to Yale's Student Accessibility Services.

16.    Ms. Doe's [REDACTED]

17.    The last nine months have been particularly difficult for Ms. Doe's [REDACTED]

[REDACTED]

18.     Ms. Doe's [REDACTED]


19.     [REDACTED]


**B.      Yale Law School's J.S.D Program**

20.     The Yale J.S.D is "designed for graduates of the LL.M program at Yale Law School who intend to teach law."

21.     The Yale Academic Bulletin of the Yale Law School, which constitutes the official publication of Yale University policies, states that J.S.D dissertations should be approved by the student's dissertation committee by May 1 of the fifth year after admission.

22.     However, the Bulletin also explicitly provides that doctoral "candidates demonstrating satisfactory academic progress may petition for an extension of candidacy past the fifth year with approval of their faculty supervisor." This statement appears in the 2024-2025 Bulletin and in previous editions.

23.     The Bulletin states that "J.S.D. candidates write their dissertation under the supervision of a committee comprised of a faculty supervisor, who must be a tenured Yale Law School faculty member, and at least two additional readers." Readers are other faculty members at Yale University who contribute to a J.S.D student's education.

24.     Additionally, the Bulletin states: "When a faculty supervisor is no longer willing or able to serve in that capacity, candidates will have up to two terms to arrange for a substitute faculty supervisor before being withdrawn from the program."

25.     In September 2022, then-Director of Graduate Studies Maria Dino explicitly stated during a program retreat attended by most doctoral students, Gordon Silverstein, and Assistant Director of Graduate Studies Ryan Harrington, that the five-year deadline was "not an essential requirement" and acknowledged that "of course some have taken much longer." This statement was made in response to a direct question from Ms. Doe about whether the requirement was essential.

26.     At least two non-disabled current J.S.D student in Ms. Doe's J.S.D. program have been enrolled substantially longer than Ms. Doe. Both students are were registered as class of 2025 candidates despite beginning the program years earlier. At least one of the non-disabled current students who has been enrolled in Ms. Doe's J.S.D program for longer than she has had her enrollment voluntarily extended by Yale through the end of the 2026 academic year.

## C.    Pattern of Discrimination and Arbitrary Deadlines

27.     On April 22, 2024, Assistant Dean Gordon Silverstein threatened to expel Ms. Doe on May 1, 2024, unless she secured a faculty supervisor who explicitly confirmed by email or phone that they would serve as her advisor. This threat came after a previous accommodation request had been denied and despite the fact that Ms. Doe had never been given notice that her faculty supervisor had withdrawn.

28.     This ultimatum gave Ms. Doe only one week to establish or reestablish a faculty supervisory relationship, [REDACTED]

29.    On April 23, 2024, [REDACTED]

30.    This deliberate interference by Dean Silverstein effectively prevented Ms. Doe from meeting the arbitrary requirement he had imposed, [REDACTED]

31.    On April 23, 2024, Ms. Doe met with Dean Silverstein to negotiate a more reasonable timeline, explaining that her previous advisor, [REDACTED]    had agreed to speak with her in late May or early June. Dean Silverstein extended the deadline to June 14, 2024.

32.    On June 11, 2024, just three days before this extended deadline, Dean Silverstein issued a new ultimatum: "If we are going to extend your candidacy into the 2024-25 academic year, it is essential to set clear benchmarks for the completion of your dissertation. [REDACTED]

has told me he agrees. An extension of your candidacy into the new academic year will require you to meet two deadlines: (1) that you will turn in to your Committee Chair or Co-Chairs a full draft of your dissertation, sufficient for completion of the degree, no later than January 6, 2025. (2) You will submit a final dissertation properly formatted and ready for formal submission to your faculty chair(s) and to the Office of Graduate Programs by April 1, 2025. If you are unable to meet either of these deadlines you will be withdrawn from the program."

33.    On June 14, 2024, faced with the imminent threat of expulsion, Ms. Doe acquiesced under protest to these terms while explicitly noting the coercive nature of the situation: "[REDACTED]

[REDACTED]

34.     In this same email, Ms. Doe explicitly noted the discriminatory nature of these requirements: "Placing me under conditions of unofficial quasi-probationary status is discriminatory as mentioned in my prior email. There are, in any case, no provisions in University policy documents that enable or permit this as a matter of the Graduate Program Office or other office."

35.     Ms. Doe also noted the potential need for accommodation in case of illness or other problems in the same email, stating that if her "ability to progress on my thesis is substantially curtailed, such as by illness, bereavement, natural disaster, interference by a member of the University staff, etc., it would be unreasonable to refuse to revisit deadlines."

36.     Significantly, Ms. Doe wrote that in acquiescing to Mr. Silverstein's deadlines that she would, as a consequence, need to be on the teaching market in the 2025-2026 academic year, and "needing to complete my dissertation by a mid-year deadline comes into conflict with pretty much every external academic deadline that is also mid-year. Therefore, to remain professionally credible in the 25-26 academic year I probably need a YLS affiliation. In order to teach as a teaching fellow or PTAI [Post-Graduate Teaching Instructor], I need a graduate student affiliation. Given this, I would also ask that if I meet the deadlines, I can maintain some

student affiliation for 25-26 if I am unable to obtain a more desirable affiliation. Optimizing for successful post-graduation employment is incompatible with optimizing for successfully completing a dissertation by deadlines earlier than the end the academic year."

37.     Ms. Doe also requested that the final deadline be moved to May 1, 2025, in accordance with the standard deadline published in the Yale Academic Bulletin in the same June 14, 2024 email.

38.     On December 23, 2024, Ms. Doe saw that Mr. Silverstein was by the Graduate Student Lounge in Yale Law School and approached him informally to explain that she had been struggling personally with the requirement he imposed to meet the January 6 deadline, given that this specially imposed requirement precluded her from making use of educational opportunities during the fall semester. Mr. Silverstein told Ms. Doe that he set the deadlines for the sake of Ms. Doe's own good and that she should "appreciate that." Ms. Doe stated that the June 11 ultimatum deadlines were damaging and a reasonable way mitigating the damage caused would be to at least confirm that he will not oppose Ms. Doe's petition to extend the date of her graduation to May 2026. Mr. Silverstein replied that he was disinclined to allow her to extend her date of graduation. Ms. Doe asked Mr. Silverstein why. Mr. Silverstein said that it was because they had agreed to the deadlines. Ms. Doe reminded Mr. Silverstein that the deadlines were not agreed but coerced, that the imposition of special deadlines is not permitted within Yale's published policies, and that even if she could produce work for the purpose of meeting Mr. Silverstein's ad hoc deadlines, this would not result in graduate education and J.S.D dissertation of sufficient quality to secure academic employment on graduation. Mr. Silverstein replied that he might change his mind and accept an extension of Ms. Doe's student

status if she wrote him a petition after turning in a draft on January 6. Ms. Doe responded that she thought his treatment of her was discriminatory and she intended to make a complaint.

39.     During this conversation, Ms. Doe noted that the J.S.D, unlike a PhD or JD, is not a degree that credentials a graduate for any new opportunities in and of itself. This is because a J.S.D is only pursued by aspiring legal academics, but it is not a requirement for legal academic employment, and a J.S.D reduces a graduate's employability as a practicing lawyer since it signals that the graduate intended or intends to pursue a career in academia, not legal practice. It is the quality of the education, faculty connections, research and scholarship produced during a J.S.D, not the diploma itself, that are of value to a J.S.D student and justify taking a J.S.D: by itself, Ms. Doe noted, merely graduating from the J.S.D program without that academic development would actually reduce her lifetime opportunities compared to having never begun it in the first place.

40.     In January 2025, Ms. Doe made a complaint against Mr. Silverstein to the Yale Office of Institutional Equity and Accessibility, the office generally tasked with hearing discrimination complaints.

41.     After an initial investigation, on March 11, 2025, Jamaal Thomas, Associate Director of the Office of Institutional Equity and Accessibility and Deputy ADA and Section 504 coordinator informed Ms. Doe via email that "I learned that Dean Silverstein was not responsible for setting the April 1st deadline for your project and does not have the authority to modify the deadline. The decision was one that was made by the Yale Law School Dean's Office. Although we could move forward with an alternative resolution process with him, he would not be in a position to make any adjustments to the deadline as an outcome of the process."

42.     Given that Mr. Silverstein told Ms. Doe on December 23, 2024, that he was responsible for the deadlines and that he imposed them for benevolent paternalistic reasons, and that he would consider changing his mind about the April 1 2025 deadline if she sent him a petition after the January 6 2025 deadline, and Mr. Silverstein told Ms. Doe could appeal to the Dean, it is clear that the deadlines did not in fact originate in the Yale Law School Dean's Office but with Mr. Silverstein. Instead, it is reasonable to infer that when Ms. Doe told Mr. Silverstein that she was making a complaint about his actions, Mr. Silverstein took adverse action in retaliation by entrenching his decision through asking the Dean's Office to adopt it as their own. This entrenchment of a discriminatory decision such that the ordinary University channels for complaints against discriminatory decisions are no longer available was an adverse action against Ms. Doe for engaging in Section 504 protected activity in such a way that would tend to discourage a person from engaging in that activity.

43.     [REDACTED]

44.     In office meetings with Mr. Silverstein, he told Ms. Doe no fewer than three times "If I wanted you gone you'd be gone". Mr. Silverstein has also no fewer than two times picked up a phone to use as a prop in his office and told Ms. Doe a statement closely to the effect of 'When someone wants to know what I think of a student I pick up the phone so there is not an email record.'

**D.    Ms. Doe's Request for Reasonable Accommodations**

45.     On March 12, 2025, Ms. Doe formally requested the following accommodations through Yale's Student Accessibility Services:

a. "The extension of my doctoral candidacy through the 2025-2026, subject to the
ordinary requirement of turning in a Progress Report my supervisor regards as
satisfactory."

b. "That the deadline for final submission of my dissertation fall no earlier than May 1st
of the year in which I am graduating, consistent with the deadline published in the Yale
Academic Bulletin of May 1st."

c. "That the administration refrain from singling me out for the imposition of additional
requirements not stipulated as part of the program in the Academic Bulletin or otherwise
applicable to doctoral students generally according to published policies."

46.     Ms. Doe submitted a detailed memorandum in support of these requested
accommodations, along with medical documentation of her disabilities.

47.     In her supporting memorandum, Ms. Doe cited legal authorities including the
Department of Education's regulations implementing Section 504, which explicitly identifies
"changes in the length of time permitted for the completion of degree requirements" as a type of
academic modification that may be required. 34 C.F.R. § 104.44.

48.     She also cited a 2020 decision by the Department of Education's Office for Civil
Rights, which expressed concern that a "policy regarding a 10-year deadline to complete the
dissertation with no exceptions for consideration of disability-related requests for
accommodations violates Section 504." (Complaint No. 01-20-2163 Brandeis University).

E.     **Yale's Refusal to Engage in Section 504 and ADA Required
Disability Accommodation/Modification Processes**

49.     On March 19, 2025, SAS Director Kimberly McKeown denied Ms. Doe's
accommodation requests in a brief email that stated only: "your requests [...] are denied as you

have received multiple extensions to complete your doctoral dissertation, and your faculty

supervisor has denied your request for an extension and set April 1, 2025 as the deadline."

50.     The denial letter did not address whether the requested accommodations would

constitute a "fundamental alteration" to the program or create an "undue burden" – the only

legitimate grounds for denying an appropriate accommodation request under Yale's own

policies and federal law.

51.     Later that day, Ms. Doe responded to McKeown, asking: "Could you please

explain the reasons why the requested accommodations are 'inappropriate or unreasonable,

constitute a fundamental alteration to an essential element of a course or program,' or 'pose a

direct threat to the health and safety of others, or pose undue financial or administrative burden

on the University?' The reasons supplied in your email do not seem to be responsive to the

criteria governing SAS decisions."

52.     McKeown did not respond to this request for clarification until March 24, 2025,

when she merely reiterated "As stated in the email, you have received multiple extensions to

complete the doctoral program," without providing any analysis of how this related to the

criteria for denying an accommodation.

53.     On March 24, 2025, Ms. Doe appealed the SAS decision to Yale's Office of

Institutional Equity and Accessibility ("OIEA") in the manner Yale University prescribes, by

sending a form to the Deputy ADA and Section 504 coordinator, Mr. Jamaal Thomas, through

the OIEA's website. In her detailed appeal, she noted that SAS had failed to provide any

legitimate reason for denying her accommodation requests under applicable legal standards.

54.     On April 1, 2025, Yale University's Deputy ADA and 504 Coordinator, Mr.

Thomas, determined that SAS should reconsider Ms. Doe's accommodation requests through its

interactive process and emailed Ms. Doe and McKeown with his findings and requirements of SAS.

55.     On April 4, 2025, without conducting any interactive process, McKeown, on behalf of SAS, again reiterated her denial of Ms. Doe's accommodation request using substantially the same reasoning, without any prior communication with Ms. Doe or reconsidering the accommodations through Yale University's interactive process. Ms. Doe returned later on April 4, 2025, to speak with Mr. Thomas who told Ms. Doe that there must have been some confusion at SAS and he would send a more detailed decision to them soon. Mr. Thomas then sent a second appeal's decision on April 14, 2025 to Ms. Doe and Ms. McKeown, affirming Ms. Doe's position that again required that SAS must reconsider its decisions.

56.     On April 17, 2025, without conducting any new meetings, communications or interactive process with Ms. Doe, SAS again denied her requests, this time claiming that it had engaged in the interactive process by reviewing documentation and speaking with program administrators.

57.     In this new denial, McKeown claimed: "SAS engaged with the program administrators to discuss the program requirements and options for participants to receive extensions to complete their dissertations. During the conversation, the program shared that your dissertation had been submitted, and your advisor stated that it was satisfactory. Additionally, the program confirmed that your advisor would not continue to serve in the role of advisor following the current term."

58.     This assertion was incorrect and misleading, as Ms. Doe's dissertation had not been submitted as a complete document, it was explicitly marked as incomplete and produced under protest.

59.     SAS further claimed: "As your advisor has stated that your dissertation is satisfactory and that he will not continue to serve in the advisory role beyond this term, it would be an alteration to the program to provide an extension to continue to work without an advisor and to work on a submitted, accepted dissertation other than to make edits."

60.     This statement disregarded Yale's own policy, outlined in the Bulletin, that when a faculty supervisor is no longer willing to serve, the student has "up to two terms to arrange for a substitute faculty supervisor." It also enabled Ms. McKeown to evade her requirement to reconsider a disability accommodation regarding the deadline for Ms. Doe's dissertation by claiming that the incomplete draft dissertation produced under express protest pending an extension decision by the SAS and OIEA processes mooted that requirement – after Ms. McKeown had twice disregarded an internal appeals decision requiring it.

61.     On April 17, 2025, Ms. Doe emailed Jamaal Thomas, Associate Director of the Yale University's Office of Institutional Equity and Accessibility, Section 504 coordinator, stating: "I think it is clear that Kim [McKeown] is acting in defiance of the OIEA appeal letter by failing to engage in an interactive process: much of her email is false, demonstrably false, and can be shown to false in an interactive process which was required by OIEA but not engaged in by SAS."

62.     On April 19, 2025, Ms. Doe noted that Professor [REDACTED] had resigned as her supervisor sometime in April 2025. According to Yale Academic Bulletin policies, she should be given up to two terms to find a substitute supervisor.

63.     Ms. Doe also noted that she had filed a dissertation status report by the required deadline, indicating she had no current supervisor and was making use of the provisions in the Bulletin to find a new one, with a plan to complete her thesis in the 2025-2026 academic year.

64.     Ms. Doe's co-supervisor from the Philosophy Department, has expressed willingness to continue supervising her during the 2025-2026 academic year.

65.     Ms. Doe has been in discussions with several professors about serving as her supervisor, but Dean Silverstein has previously sabotaged her efforts to secure new supervisors.

66.     During the 2024-2025 academic year, Ms. Doe had no actual supervision meetings with Professor [REDACTED] received no written comments on her writing, and was told he had no time to meet outside of 15-minute office hour appointments [REDACTED]

### F.     Legal Obligations and Violations

67.     Yale University is obligated under Section 504 of the Rehabilitation Act and the ADA to provide reasonable accommodations to qualified students with disabilities.

68.     Yale's own Student Accessibility Services policies state that students have the right to "Receive reasonable accommodations that do not fundamentally alter a policy, requirement, or learning objective of a program or course, and do not place an undue financial or procedural burden on the institution or its representatives."

69.     SAS may only deny an accommodation if it is "inappropriate or unreasonable, constitute[s] a fundamental alteration to an essential element of a course or program; pose[s] a direct threat to the health and safety of others; or pose[s] undue financial or administrative burden on the University."

70.     Yale's failure to provide Ms. Doe with reasonable accommodations for her documented disabilities violates Section 504 of the Rehabilitation Act and the ADA.

71.     Yale's failure to engage in a meaningful interactive process to discuss potential accommodations also violates its obligations under Section 504, the ADA, and its own policies.

72.     The Department of Education's Office for Civil Rights has emphasized that "Section 504 envisions a meaningful and informed process with respect to the provision of modifications, e.g., through an interactive and collaborative process between the university and the student. If a university denies a request for a modification, it should clearly communicate the reasons for its decision to the student so that the student has a reasonable opportunity to respond and provide additional documentation that would address the university's objections." (OCR Complaint No. 06212198).

73.     Yale has failed to clearly communicate the reasons for its decision in a manner that would enable Ms. Doe to respond meaningfully to its objections.

74.     Yale has imposed requirements on Ms. Doe that it has not imposed on similarly situated students without disabilities, constituting disparate treatment on the basis of disability.

## III.    Legal Claims

### COUNT I: Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

75.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

76.     Ms. Doe is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act.

77.     Yale University is a recipient of federal financial assistance and is therefore subject to Section 504.

78.     Yale has discriminated against Ms. Doe on the basis of her disability by:

a. Failing to provide her with reasonable accommodations;

b. Failing to engage in a meaningful interactive process;

c. Imposing arbitrary deadlines and requirements not applied to similarly situated students without disabilities;

d. Failing to modify academic requirements that have a discriminatory effect on the basis of disability; and

e. Applying standards and criteria that have the effect of discriminating on the basis of disability.

79.     The extension of candidacy and dissertation deadline that Ms. Doe has requested are reasonable accommodations that would not fundamentally alter the nature of Yale's doctoral program, as evidenced by Yale's own policies permitting such extensions and the presence of other students who have been permitted to remain in the program for longer periods.

80.     Defendants Yale University and Ms. Kimberly McKeown have repeatedly disregarded the decisions of Mr. Jamaal Thomas, Yale University's own Section 504 coordinator, overturning Ms. Kimberly McKeown's denial of Ms. Doe's

accommodation/modification requests. This violates Section 504's requirement that "a recipient that employs fifteen or more persons shall adopt grievance procedures that provide for the prompt and equitable resolution of complaints" 34 C.F.R. § 104.7(b).

81.     As a direct and proximate result of Yale's discriminatory conduct, Ms. Doe has suffered and continues to suffer harm, including emotional distress, exacerbation of her disability symptoms, loss of academic and professional opportunities and potential for further and irrevocable loss of academic and professional opportunities.

**COUNT II: Violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq.**

82.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83.     Ms. Doe is a qualified individual with a disability within the meaning of the ADA.

84.     Yale University is a place of public accommodation within the meaning of Title III of the ADA.

85.     Yale has discriminated against Ms. Doe on the basis of disability by:

a. Failing to make reasonable modifications in policies, practices, and procedures necessary to afford its services to an individual with a disability;

b. Utilizing standards and criteria that have the effect of discriminating on the basis of disability; and

c. Failing to take necessary steps to ensure that Ms. Doe is not excluded or denied services because of the absence of auxiliary aids and services.

86.     The accommodations Ms. Doe has requested are reasonable modifications that would not fundamentally alter the nature of Yale's program.

87.     As a direct and proximate result of Yale's discriminatory conduct, Ms. Doe has suffered and continues to suffer harm, including emotional distress, exacerbation of her disability symptoms, and potential loss of her academic and professional opportunities.

## COUNT III: Breach of Contract

88.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

89.     A contractual relationship exists between Ms. Doe and Yale University, governed in part by the terms and conditions set forth in the Yale Academic Bulletin and other university policies.

90.     The Yale Academic Bulletin explicitly provides that doctoral "candidates demonstrating satisfactory academic progress may petition for an extension of candidacy past the fifth year with approval of their faculty supervisor" and that "When a faculty supervisor is no longer willing or able to serve in that capacity, candidates will have up to two terms to arrange for a substitute faculty supervisor before being withdrawn from the program."

91.     Yale has breached its contractual obligations to Ms. Doe by:

a. Imposing arbitrary deadlines not set forth in its published policies;

b. Failing to allow her the two terms provided by the Bulletin to secure a new supervisor after Professor [REDACTED] resignation;

c. Threatening to withdraw her from the program for failing to meet deadlines not established in the contract; and

d. Failing to follow its own policies regarding disability accommodations.

92.    As a direct and proximate result of Yale's breach of contract, Ms. Doe has suffered and continues to suffer damages.

**COUNT IV: Retaliation in Violation of Section 504 and the ADA**

93.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94.    Ms. Doe engaged in protected activity by requesting reasonable accommodations for her disabilities and appealing the denial of those accommodations.

95.    Yale, through its agents and employees, retaliated against Ms. Doe for engaging in this protected activity by:

a. Imposing increasingly onerous deadlines and requirements;

b. Interfering with her attempts to secure faculty supervisors;

c. Providing false and misleading information to OIEA in response to her appeal; and

d. Refusing to engage in a meaningful interactive process even after being directed to do so by OIEA.

96.     This retaliatory conduct would dissuade a reasonable person from exercising their rights under disability laws.

**97.**     As a direct and proximate result of Yale's retaliatory conduct, Ms. Doe has suffered and continues to suffer harm.

## IV.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jane Doe respectfully requests that this Court enter judgment in her favor and against Defendants and grant the following relief:

A.     A declaratory judgment that Defendants' actions violate Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and Connecticut state law;

B.     A permanent injunction ordering Defendants to:

1.     Grant Ms. Doe an extension of her doctoral candidacy through the 2025-2026 academic year;

2.     Allow Ms. Doe until May 1, 2026 to complete and submit her dissertation, consistent with the deadline published in the Yale Academic Bulletin;

3.     Refrain from imposing additional requirements on Ms. Doe not applicable to other J.S.D students;

4.     Allow Ms. Doe up to two terms to secure a new faculty supervisor, as provided in the Yale Academic Bulletin;

5.     Engage in a proper interactive process for any future accommodation requests by Ms. Doe;

C.      Compensatory damages in an amount to be determined at trial for the emotional

distress, mental anguish, and other injuries caused by Defendants' discriminatory

and retaliatory conduct;

D.      Attorneys' fees, costs, and expenses pursuant to 29 U.S.C. § 794a and 42 U.S.C.

§ 12205; and

E.      Such other and further relief as the Court deems just and proper.

Respectfully Submitted,

PLAINTIFF

By:_____/s/_____
Alexander T. Taubes, Esq.
Federal Bar No.: ct30100
Alexander T. Taubes
470 James Street, Suite 007
New Haven, CT 06513
(203) 909-0048
alextt@gmail.com

## VERIFICATION OF THE PLAINTIFF

      I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[REDACTED]

—

Jane Doe

Executed on    5/15/2025