## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE, | : | **Civil Action No: 25-cv-787-OAW** |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY; KIMBERLY MCKEOWN, | : | |
| AND GORDON SILVERSTEIN; | : | |
| *Defendants.* | : | May 23, 2025 |

### <u>RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION</u>

Ms. Doe seeks to enjoin Defendants from violating Title III of the ADA and Section 504 by preventing them from altering the status quo by terminating her doctoral candidacy. Absent this immediate injunctive relief, Ms. Doe will be irreparably harmed. This Court and others have ruled that a plaintiff presumptively suffers irreparable injury where the defendant has violated a civil rights statute. *Hernandez v. Enfield*, No. 3:19-cv-1907, at 6-7 (D. Conn. June 14, 2024) (applying presumption because of "the difficulty of quantifying the harm"), also citing *Gibson v. U.S. I.N.S.*, 541 F.Supp. 131, 136 (S.D.N.Y, 1982) ("where the statutory civil rights of employees [under Title VII] are found to have been violated, irreparable injury may be presumed from the loss of human dignity which such violations engender" cited in *Hernandez* at 7). The ongoing harms caused by Defendants' actions go beyond the harm of a civil rights violation. Ms. Doe will be delayed in her studies, and as this Court recently held in *Du v. DHS*, 3:25-cv-644 (D. Conn. April 28, 2025), "[t]he loss of timely academic progress alone is sufficient to establish irreparable harm," at 8. Like the *Hernandez* plaintiff who was "effectively denied the opportunity to serve as a public official, a harm that is undeniably difficult to quantify," Ms. Doe faces denial of the opportunity to complete her doctoral studies and pursue her chosen profession—harms that are similarly unquantifiable. *Hernandez*, at 7. Moreover,

Ms. Doe's physical and emotional health will significantly deteriorate, Exh. L (opinion of treating physician), and as this Court further held in *Du*, her "anxiety and fear . . . constitute[s] irreparable harm," *id.* at 7, as well. Like the psychological trauma in *J.S.R. v. Sessions*, 330 F.Supp.3d 731, 741 (D.Conn. 2018) that was "likely to continue even after family reunification," Ms. Doe's academic and reputational injuries from premature termination will persist even if she is later reinstated. *J.S.R.*, 330 F.Supp.3d at 745. As in *J.S.R.*, in which "every day adds to the gravity of their situation," *id.* at 740, here too, with the next semester fast approaching, and along with it, deadlines to bid for classes and teaching assistantships for next semester, every day compounds Ms. Doe's harm. These harms "cannot be remedied by the court upon conclusion of this case, nor via mere money damages." *Id.* at 8. Indeed, as *Hernandez* recognized, the Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) has made it "difficult, in many situations, for a plaintiff alleging a violation of Section 504 and Title II of the ADA to demonstrate entitlement to compensatory damages," making injunctive relief all the more essential. *Hernandez*, at 7. This Court should act immediately to preserve the status quo, prevent irreparable harm, and enjoin Defendants from violating the ADA and Section 504 by improperly terminating Ms. Doe's education.

# TABLE OF CONTENTS

*I.   STATEMENT OF FACTS* ..................................................................................*4*

  **A.   Plaintiff's Status and Documented Disabilities** ...............................**5**

  **B.   Yale's Published Policies Permitting Extensions** ............................**6**

  **C.   Disparate Treatment of Non-Disabled Students** ............................**7**

  **D.   Arbitrary Deadlines and Coerced Compliance** ...............................**8**

  **E.   Denial of Future Academic Year Extension Despite Regular Practice** ..................**9**

  **F.   Faculty Advisor Resignation and Yale's Interference** ....................**9**

  **G.   Accommodation Requests and Deficient Responses** ......................**10**

  **H.   Imminent Academic Year Deadline Creating Emergency Circumstances** ................**16**

*II.   LEGAL STANDARD* .......................................................................................*17*

*III.   ARGUMENT* ...................................................................................................*18*

  **A.   Plaintiff Will Be Irreparably Harmed Absent an Injunction to Prevent Ongoing Violations of Section 504 and the ADA** ...............................................**18**

    1. Loss of Timely Academic Progress and Educational Disruption ....................20
    2. Significant Deterioration of Medical Condition ................................21
    3. Permanent Professional and Reputational Harm ................................22
    4. Irreparable Loss of Dignity from Civil Rights Violations ......................23

  **B.   Plaintiff is Likely to Succeed on the Merits of Her Claims** ...............**25**

    1.   Yale Unlawfully Denied Doe Reasonable Accommodations. ....................25
    2.   Yale Unlawfully Denied Doe an Effective Grievance Procedure. ...............28
    3.   Yale Unlawfully Retaliated Against Doe ...................................31

  **C.   The Balance of Hardships Tips Decidedly in Plaintiff's Favor** ...........**37**

  **D.   A Preliminary Injunction Will Serve the Public Interest** ..................**38**

*IV.   CONCLUSION* ................................................................................................*41*

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alameen v. Coughlin*,
   892 F. Supp. 440 (E.D.N.Y. 1995)..................................................................................24

*Alexander v. Choate*,
   469 U.S. 287 (1985) ........................................................................................................28

*Bartell v. Grifols Shared Services NA, Inc.*,
   618 F. Supp. 3d 275 (M.D.N.C. 2022)...........................................................................39

*Bonnette v. D.C. Ct. of Appeals*,
   796 F. Supp. 2d 164 (D.D.C. 2011) ...............................................................................20

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   596 U.S. 212 (2022) ...................................................................................................2, 18

*D'Amico v. N.Y. State Bd. of Law Examiners*,
   813 F. Supp. 217 (W.D.N.Y. 1993) ...............................................................................20

*Davis v. Power Auth.*,
   No. 22-488 (2d Cir. Apr. 25, 2023)................................................................................30

*Doe v. Samuel Merritt University*,
   921 F. Supp. 2d 958 (N.D. Cal. 2013) ...........................................................................20

*Du v. DHS*,
   3:25-cv-644 (D. Conn. April 28, 2025)...........................................................1, 17, 21, 24

*Emeldi v. Univ. of Oregon*,
   673 F.3d 1218 (9th Cir. 2012),.......................................................................................36

*Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*,
   630 F.3d 1153 (9th Cir. 2011)..........................................................................20, 23, 24

*Gaidasz v. Genesee Valley Bd. of Co-op. Educ. Sys. (Boces)*,
   791 F. Supp. 2d 332 (W.D.N.Y. 2011). .........................................................................31

*Gibson v. U.S. I.N.S.*,
   541 F. Supp. 131 (S.D.N.Y. 1982) .............................................................................1, 23

*Guckenberger v. Boston Univ.*,
   974 F. Supp. 106 (D. Mass. 1997)..................................................................................30

*Henrietta D. v. Bloomberg.*,
   331 F. 3d 261 (2d. Cir. 2003) .........................................................................................27

*Hernandez v. Enfield*,
   No. 3:19-cv-1907 (D. Conn. June 14, 2024) .......................................................1, 18, 23, 24

*J.S.R. v. Sessions*,
   330 F.Supp.3d 731 (D.Conn. 2018) ...................................................................2, 19, 21, 24

*Jones v. Nat'l Conf. of Bar Exam'rs*,
   801 F. Supp. 2d 270 (D. Vt. 2011) .................................................................................20

*Marlo M. ex rel. Parris v. Cansler*,
   679 F.Supp.2d 635 (E.D.N.C. 2010) ..............................................................................40

*Pharmaceutical Soc. of NY v. Dept. of Social Ser.*,
50 F. 3d 1168 (2d Cir. 1995) ........................................................................40

*Reuters Ltd. v. United Press Int'l, Inc.*,
903 F.2d 904 (2d Cir. 1990) ..........................................................................23

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
749 F.2d 124 (2d Cir. 1984) (per curiam) ......................................................23

*Seaman v. Commonwealth of Virginia*,
3:22-cv-6 (W.D. Va. March 23, 2022) ...........................................................21

*Semmes Motors, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970) ........................................................................21

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*,
190 F.Supp.2d 577 (S.D.N.Y. 2002) ..............................................................17

*Standard Microsystems Corp. v. Texas Instruments, Inc.*,
916 F.2d 58 (2d Cir.1990) .............................................................................17

*Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*,
790 F. Supp. 1197 (D. Conn. 1992) ...............................................................23

*Weixel v. Bd. of Educ. of City of N.Y.*,
287 F.3d 138 (2d Cir. 2002) ..........................................................................31

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) ..........................................................................................16

## I.    STATEMENT OF FACTS

Plaintiff incorporates by reference the factual allegations set forth in her Complaint. The following facts establish the basis for injunctive relief and emergency consideration:

### A.    Plaintiff's Status and Documented Disabilities

1.    Plaintiff Jane Doe is a candidate in Yale Law School's J.S.D. (Doctor of the Science of Law) program, which is "designed for graduates of the LL.M program at Yale Law School who intend to teach law." Compl. ¶ 19, Exh. A at 78.

2.    Plaintiff has been diagnosed with multiple disabilities that substantially limit major life activities, including ████████████████████████████████████ ████████████████████████████████████

3.      These disabilities significantly impair Plaintiff's ability to work when exacerbated by acute stress or positions of extreme precarity. Compl. ¶ 16. Exh. M 1-2.

4.      Plaintiff has submitted comprehensive medical documentation of these disabilities to Yale's Student Accessibility Services. Compl. ¶ 15.

5.      After examining Jane Doe on May 19, 2025, on May 20, 2025, Jane Doe's physician wrote a letter explaining Ms. Doe's condition and how it has worsened since Ms. Doe's physician previously wrote to Yale University's Student Accessibility Services. Exh. L.

6.      Ms. Doe's physician also, upon examining Ms. Doe, explained that should Ms. Doe be "removed from her program without being able to complete her studies in the 2025-2026 academic year, her condition will significantly deteriorate." *See* Exh. L (filed under seal).

7.      The May 20, 2025 physician letter refers back to a March 11, 2025, March 26, 2025, and March 27, 2025 letters Ms. Doe's physician wrote to Yale. These are included as Exh. M, Exh. N, and Exh. O (filed under seal).

8.      The treating physician's letters document a pattern of deterioration linked to "uncertainty in academic standing" that produces a "snowball effect" of ██████████ ████████████████████████████████████████

**B.      Yale's Published Policies Permitting Extensions**

9.      Yale Law School's Academic Bulletin explicitly states that doctoral "candidates demonstrating satisfactory academic progress may petition for an extension of candidacy past the fifth year." Compl. ¶ 21. See Exh. A., at 78.[1]

---

[1] The complete Yale Law School 2024-2025 Academic Bulletin is available at https://bulletin.yale.edu/sites/default/files/yale-law-school-2024-2025.pdf .

10.     The Bulletin further provides that "When a faculty supervisor is no longer willing or able to serve in that capacity, candidates will have up to two terms to arrange for a substitute faculty supervisor before being withdrawn from the program." Compl. ¶ 23. *See* Exh. A. at 78.

11.     The Bulletin establishes no maximum number of years a candidate may extend their registration. Compl. ¶ 21. See Exh. A.

12.     Yale University's Deputy ADA and Section 504 Coordinator confirmed that "students should be able to rely on the policy statements in the bulletin (they include policy, not guidance or summaries)" *See* Exh. B.

13.     Yale's former Director of Graduate Studies explicitly stated during a 2022 J.S.D. program retreat that the five-year deadline was "not an essential requirement" and acknowledged that "of course some have taken much longer." Compl. ¶ 24.

**C.    Disparate Treatment of Non-Disabled Students**

14.     At least two non-disabled students in Plaintiff's J.S.D. program have been permitted to remain enrolled substantially longer than Plaintiff. Compl. ¶ 25; Exh. C.

15.     Both students were registered as class of 2025 candidates despite having begun the program years earlier. Yale University has already voluntarily extended at least one of these two non-disabled enrolment-eligibility through the end of the 2026 academic year and registered her as member of the class of 2026. *Id.*

16.     Yale's Section 504 Coordinator, Mr. Thomas, confirmed in his April 1, 2025 decision that "the two students you identified were enrolled in the JSD program for a longer period than you." Exh. C. at 1.

### D.     Arbitrary Deadlines and Coerced Compliance

17.     On June 11, 2024, Defendant Silverstein unilaterally imposed arbitrary deadlines not found in Yale's published policies, requiring Plaintiff to submit: a. A full draft of her dissertation by January 6, 2025; and b. A final dissertation by April 1, 2025, threatening that she would be "withdrawn from the program" if she failed to meet these deadlines. Compl. ¶ 29. Exh. Q.

18.     On June 14, 2024, Plaintiff acquiesced to these terms under protest, stating: "Given that it is obviously impossible to arrange for any alternative advisor between the time you sent your email, and prior to the the June 14 deadline you set, and since I face the threat of expulsion and irreperable reputational damage... I have no meaningful choice in the matter. I am placed in a position where I would agree to anything under such a threat." Compl. ¶ 30. Exh. R.

19.     In this same communication, Plaintiff explicitly noted the discriminatory nature of these requirements and potential need for accommodation: "Placing me under conditions of unofficial quasi-probationary status is discriminatory... In the event, however unlikely, that my ability to progress on my thesis is substantially curtailed, such as by illness... it would be unreasonable to refuse to revisit deadlines." Compl. ¶¶ 31-32. Exh. R.

20.     Due to her disabilities, which were exacerbated by the acute stress of these arbitrary requirements and threats, Plaintiff was unable to meet the April 1, 2025 deadline with a complete dissertation. Compl. ¶ 37.

21.     The dissertation draft sent to ██████ on April 1, 2025 was substantially identical to the January 6, 2025 draft, with the addition of front matter stating that the thesis was incomplete and produced under protest while OIEA was conducting their review. Exh. S.

### E.     Denial of Future Academic Year Extension Despite Regular Practice

22.     On December 23, 2024, Defendant Silverstein informed Plaintiff that even if she met the April 1 deadline, he would be disinclined to permit her to continue as a degree candidate for the 2025-26 academic year—a courtesy routinely extended to other doctoral students without disabilities. Compl. ¶ 35.

23.     When Plaintiff noted that merely meeting Silverstein's ad hoc deadlines would not produce a dissertation of sufficient quality for academic employment, Silverstein stated that he might reconsider only if she first met the January 6, 2025 deadline. Compl. ¶ 35.

24.     During this December 23, 2024 conversation, Ms. Doe told Silverstein that the arbitrary deadlines were damaging her ability to participate in her educational program, that she believed they were discriminatory, and that she intended to file a complaint. *Id.*

### F.     Faculty Advisor Resignation and Yale's Interference

25.     On April 22, 2024, Defendant Silverstein wrote "In light of the decision by the Student Accessibility office against requesting any additional [disability] accommodations" that if Plaintiff failed to a new supervisor/advisor by May 1, 2024, she would be expelled. Plaintiff received no prior formal notice that her supervisor had withdrawn. Compl. ¶ 24.

26.     When Plaintiff obtained a written commitment from ███████████ to serve as her advisor on April 23, 2024, Defendant Silverstein interfered with this arrangement, causing ███yn to retract his offer on the same day. Compl. ¶¶ 26-27.

27.     Plaintiff's faculty supervisor, ███████████, stated his unwillingness to continue to supervise in April 2025 and Plaintiff told ██████ that she would therefore need to find a new supervisor. Under Yale's policies, Plaintiff should be allowed up to two terms to secure a new supervisor. Compl. ¶¶ 52-53, Exh. A.

28.     Plaintiff's co-supervisor from the Yale Philosophy Department, ████████ ████ stated a willingness to continue supervising her during the 2025-2026 academic year, so long as she secures a replacement for ██████. Compl. ¶ 54. The offer depends on finding a replacement because a J.S.D requires a supervisor with a Law School faculty appointment.

29.     Plaintiff has been actively discussing potential supervision with other Law School professors, but Yale has not acknowledged her right to the additional terms to find a new advisor as provided in the Bulletin, despite Plaintiff invoking this provision in her annual Progress Report filed with Silverstein's Graduate Program. Compl. ¶¶ 54-55., Exh. T at 2.

**G.     Accommodation Requests and Deficient Responses**

30.     On March 12, 2025, Plaintiff formally requested reasonable accommodations through Yale's Student Accessibility Services:

1. The extension of my JSD candidacy through the 2025-2026, subject to the ordinary requirement of turning in a Progress Report my supervisor regards as satisfactory.

2. That the deadline for final submission of my JSD thesis fall no earlier than May 1st of the year in which I am graduating, consistent with the deadline published in the Yale Law School Bulletin, pg. 78 of May 1st.

3. That the Yale Law School administration, and the Graduate Program in particular, refrains from singling me out for the imposition of additional requirements not stipulated as part of the JSD program in the Law School Bulletin or otherwise applicable to JSD students generally according to published policies.

*See* Exh. D (March 12, 2025 Request for Accommodations).

31.     SAS Director McKeown denied these requests on March 19, 2025, providing only the cursory explanation that "you have received multiple extensions to complete your

doctoral dissertation, and your faculty supervisor has denied your request for an extension."
Compl. ¶¶ 40-41. Exh E.

32.    This denial failed to address whether the requested accommodations would
constitute a "fundamental alteration" or create an "undue burden"—the grounds for denying
accommodations under Yale's own policies and federal law. Compl. ¶ 41. Exh. F. at 1.

33.    Plaintiff requested clarification of how her accommodations would cause an
undue burden, fundamentally alter the program, or would otherwise meet SAS's policy for
denying accommodation requests. Exh. F at 2. In response, McKeown wrote only "As stated in
the email, you have received multiple extensions to complete the doctoral program," Compl. ¶¶
42-43. Exh. F at 1.

34.    In response, Plaintiff immediately followed Yale's official Section 504 grievance
procedure by filing an appeal of SAS's decision to Yale's Office of Institutional Equity and
Accessibility (OIEA), which is the office that handles disability accommodation grievances.
Jamaal Thomas – Yale's Deputy ADA Coordinator and Section 504 Compliance Officer – was
the designated official to review her appeal. Compl. ¶¶ 44–45. *See* Exh. G., Exh. U.

35.    On April 1, 2025, Mr. Thomas emailed a response to Plaintiff sustaining her
appeal. He agreed that SAS's denial was not consistent with Yale's obligations under disability
law and directed SAS to reconsider Plaintiff's request through an "interactive process" with
Plaintiff. (Exh C.). Specifically, Mr. Thomas wrote in his first decision to Plaintiff and
Defendant McKeown that "The information I learned during this review does not suggest that
the requested accommodations to extend your JSD candidacy or to extend the deadline for final
submission of your thesis would present an undue hardship, financial or administrative burden
to the institution, as other students have been enrolled in the program for a longer period." *Id*.

Yale's own Section 504 Coordinator determined that Plaintiff's request should be granted or at least properly considered, and instructed SAS to work with Plaintiff to find a solution.

36.    Mr. Thomas also noted when deciding the appeal in favor of Plaintiff's position that "[d]uring my review, I learned that the two students you identified were enrolled in the JSD program for a longer period than you. I also reviewed the notes from your medical provider, which explained that your symptoms have interfered with ███████████████████ progress over the last ten months and have made it ███████████████████████ ████████████████████████████████████ over the last four months. The provider recommended an extension of the deadline through the 2025-26 academic year" and that "As a result of this review, I have determined that SAS should reconsider your accommodation request through its interactive process." Exh. C.

37.    The SAS interactive process, as defined by Yale University, includes, at a minimum, "2. Student receives contact from the appropriate SAS Staff member. 3. Student meets with SAS Staff member to discuss disability-related access barriers and potential accommodations. 4. SAS Accommodation Committee reviews the accommodation request for appropriate and reasonable accommodations to remove the disability-related access barrier. 5. SAS communicates decision to student and issues Accommodation Letter to student and appropriate Dean." Exh. H.

38.    Instead of engaging in any interactive dialogue, Defendant McKeown defied Mr. Thomas's directive. On April 4, 2025, just three days after the Section 504 Coordinator's decision, McKeown sent an email maintaining her refusal to grant an extension without meeting Plaintiff, engaging in any prior communication with Plaintiff, or considering any alternatives, contrary to the required SAS interactive process procedure. *See* Exh. V. This April 4 email

falsely stated that Ms. Doe's dissertation "only requires formatting," despite it plainly being incomplete; and falsely stating that "an extension . . . is denied as it is not needed."

39.    Concerned by this non-compliance, Plaintiff met with Mr. Thomas to ask how to proceed later the same day on April 4, 2025. Mr. Thomas verbally advised Plaintiff that OIEA would issue a more detailed letter directing SAS to reconsider and that she should not take further action until receiving it during a meeting with Plaintiff on April 4. Compl. ¶46.

40.    Following Mr. Thomas's advice regarding the April 1 deadline, Plaintiff submitted to ███████ on April 1, 2025 the same draft from January 6, 2025, but with front matter stating that the thesis was incomplete and produced under protest while OIEA was conducting their review. The front matter of the April 1 draft thesis explained that one of the chapters had not been written yet and most of the remaining chapters were incomplete. Exh. S.

41.    Ten days later, on April 14, 2025, Mr. Thomas provided a formal written decision on Plaintiff's appeal (in the form of a memorandum dated "April 1, 2025"). In this detailed letter, the Section 504 Coordinator reiterated that SAS's initial denial was not justified, ruling that SAS was required to properly reconsider the request via their interactive process. "The information that I learned during this review also supports a finding that SAS did not provide you with an explanation for its decision in relation to the criteria outlined in its Statement of Rights and Responsibilities. As a result of this review, I have determined that SAS should reconsider your first two accommodation requests through its interactive process." This letter was emailed on April 14, 2025, but backdated to April 1. Exh. I (OIEA Accommodation Appeal, No. 2024078901), Exh. J (April 14 email providing the second appeal decision).

43.    Only three days later, on April 17, 2025, without conducting any interactive process with Plaintiff, Defendant McKeown issued yet another denial of Plaintiff's

accommodation request – this time offering an entirely new rationale. In this third denial letter, McKeown falsely asserted that Plaintiff's dissertation had already been "submitted and satisfactory" and claimed that giving Plaintiff more time would constitute "an alteration to the program." Compl. ¶¶ 46–49. Exh. W.

44.    These statements were inaccurate: Plaintiff's dissertation draft was explicitly marked as incomplete, with the April 1, submission being substantially identical to her January 6 draft but for additional front matter explaining its incomplete status and that it was produced under protest. The front matter specifically noted that certain chapters were incomplete, and another chapter had not been written. Merely allowing additional time, as Defendants routinely do for non-disabled students, would not alter any curriculum or academic standard. Plaintiff raised this issue with Mr. Thomas by email on April 17, in reply to McKeown. Exh. X at 10.

45.    Moreover, McKeown on behalf of SAS rendered her April 17 decision without conducting the required interactive meeting with Plaintiff. Yale's own procedures stipulate that an interactive process must include consultation with the student (Yale's published policy on accommodations requires meeting with the student to discuss the request), but no such meeting, or even email exchange, was attempted. (See Exh. H, Yale's website on interactive process).

46.    After SAS's third denial, Mr. Thomas informed Plaintiff, on April 17. that he was not sure how to proceed. After several weeks of increasingly urgent email communication from Plaintiff, Mr. Thomas wrote that the only appropriate step within Yale would be to make a complaint about Defendant McKeown's conduct to Alexa Lindauer, OIEA Deputy Director. See Exh. X at 9, 8, and 7.

47.    Plaintiff accordingly emailed and met with Ms. Lindauer. However, no timely relief was forthcoming: Plaintiff was told that any further investigation or decision on her

appeal would take several months – a timeline that would run well past the date Yale intended to terminate her enrollment. Exh. X. at 1.

48.     Faced with time running out towards the end of her enrollment and the fact that McKeown's was actively defying the decisions of her own office's appeal's procedure, Plaintiff attempted a resolution by availing herself of Yale Law School's internal complaint and resolution process. On May 6, Plaintiff wrote to the Yale Law School Dean's Office make a formal complaint on Yale Law School's Bulletin's "Rights and Duties" against Defendant Silverstein, proposing, as is permitted under the Bulletin's Rules of Discipline (Pg 52-54) that the complaint be resolved through non-adversarial mediation. Exh. Y at 5.

49.     The Dean of the Law School designated Monica Maldonado, Yale Law School Associate Dean for Academic Affairs to hear Plaintiff's complaint against Defendant Silverstein. Exh. Y at 4.

50.     On May 14, 2025, Ms. Maldonado emailed Plaintiff stating that she would not be able to resolve the complaint, since the Bulletin's "Rights and Duties" apply only to students and faculty, which she interpreted to exclude Defendant Silverstein, and that she would forward the complaint to Human Resources instead. Exh. Y at 3.

51.     An adverse finding by Yale Law School's human resources department might impact Silverstein's future conduct, but it would not provide Plaintiff relief from the damage he had inflicted or the irreparable harm she would suffer from being removed from the J.S.D program. This decision by Ms. Maldonado, just one day before the May 15 end of term, exhausted Plaintiff's internal avenues for resolving her civil rights complaints within Yale University.

**H.    Imminent Academic Year Deadline Creating Emergency Circumstances**

53.    Ms. Doe repeatedly asked the Yale Law School's Register's office when she will be removed as a student from Yale Law School. Registrar Heather Abbott previously wrote that she was "not sure of the exact date." (Exh. P).

54.    However, on May 20, 2025, Ms. Abbott confirmed to Ms. Doe that Yale Law School "Students graduate upon degree conferral. This year Law School degrees are conferred on May 28." (Exh. P at 1).

55.    This rapidly approaching deadline creates a true emergency situation requiring immediate judicial intervention.

56.    Forced graduation or withdraw would irreparably harm Plaintiff's academic career prospects, as the quality of education, faculty connections, and scholarship produced during a J.S.D.—not merely obtaining the degree—are what create professional opportunities. Compl. ¶ 36. Plaintiff's Philosophy Dept. co-supervisor has stated he plans to retire within the next couple of years, so reinstatement by court order would not restore Plaintiff's opportunity to complete her work under his supervision. Moreover, reinstatement by court order, after a period of absence from classes, which cannot applied for or joined mid-term as either a student or teaching assistant, would be tainted by visible stigma: rather than being a student at Yale as a result of earning her place through Yale's admission's process, if withdrawn, graduated or expelled and returned, Plaintiff's reinstatement would be visibly noticed by faculty and understood as the result of a court order given a deficiency in Yale's improper treatment of Plaintiff's highly stigmatized disabilities. Given that Plaintiff, like other J.S.Ds, aims to apply for academic employment after successfully completing her education, reinstatement that would make visible the her stigmatized disabilities and the fact that she had to take legal action against

16

Yale would substantially damage opportunities for mentorship by faculty who would not wish to be seen as betraying their University, and for future employment by hiring committees weary of hiring as a new colleague someone known to have sued their last University given accommodation denial.

## II.    LEGAL STANDARD

To obtain a preliminary injunction, Plaintiff must establish: (1) a likelihood of success on the merits; (2) that the plaintiff will suffer irreparable harm if the injunction is denied; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). As shown by the foregoing facts and the following points, all four *Winter* factors are satisfied because an injunction to maintain Ms. Doe's enrollment and require Yale to accommodate her, pending final resolution of the case, is just and appropriate.

Unlike a preliminary injunction, a temporary restraining order is not constrained by Rule 65(a)'s requirement of notice to the adverse party. *See Standard Microsystems Corp. v. Texas Instruments, Inc*., 916 F.2d 58, 62 (2d Cir.1990) ("Where speed is needed, the rules of procedure provide for temporary restraining orders, even without notice, to prevent irreparable harm." (citing Fed.R.Civ.P. 65)). The court's order should detail the acts restrained or required, must be reduced to a written order, and explain why the ruling should be issued without adequate notice. Fed. R. Civ. P. 65(b). However, notice has in fact been served on Defendants. The standard for granting a preliminary injunction and a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure is identical. *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd*., 190 F.Supp.2d 577, 580 (S.D.N.Y. 2002).

III.    **ARGUMENT**

A.    **Plaintiff Will Be Irreparably Harmed Absent an Injunction to Prevent Ongoing Violations of Section 504 and the ADA**

Plaintiff addresses irreparable harm first, because it was the primary focus of this Court's prior order. This Court questioned Plaintiff's assertion "that once a person is discharged from a J.S.D program, there is no opportunity to continue pursuing formal education," noting that "there is no assertion that Plaintiff cannot be reinstated to the same graduate program should the court find she is entitled to that relief." ECF No. 29. While Plaintiff does not dispute this Court's authority to order reinstatement, such a remedy would come only after Plaintiff has suffered multiple forms of irreparable harm that cannot be undone.

As this Court recently held in *Du v. DHS*, *supra*, "[t]he loss of timely academic progress alone is sufficient to establish irreparable harm." Moreover, the Court found that students' "anxiety and fear, as well as the disruption that detention and deportation pose to their personal, academic, and professional pursuits constitute[s] irreparable harm." *Id.* at 7. In *Du*, this Court specifically recognized that maintaining the status quo for students—allowing them to remain in their educational programs pending resolution of their claims—served the public interest by preventing unwarranted disruptions to numerous lives and avoiding chaos. The principle applies with equal force here: it is better to maintain Ms. Doe's enrollment while her claims are adjudicated than to inflict the irreparable harm of forced termination.

In *Hernandez,* this Court addressed whether violations of the ADA and Section 504 constitute irreparable harm. The Court held that "in cases where a plaintiff's civil rights have been violated, courts within the Second Circuit often apply a rebuttable presumption that irreparable injury exists because of the difficulty of quantifying the harm done to the plaintiff.

See, e.g., *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1208 (D. Conn. 1992) ("The court finds irreparable harm may be presumed in this case because . . . the plaintiff has presented sufficient evidence to establish that its rights under the [Fair Housing] Act have been violated."); *Gibson v. U.S. I.N.S., 541 F. Supp.* 131, 136 (S.D.N.Y. 1982) ('[W]here the statutory civil rights of employees [under Title VII] are found to have been violated, irreparable injury may be presumed from the loss of human dignity which such violations engender.')." *Id.* at 6-7.

This Court found irreparable harm where "as a result of the defendants' discrimination, Hernandez has effectively been denied the opportunity to serve as a public official, a harm that is undeniably difficult to quantify." *Id.* at 7.

*Hernandez* thus provides three separate paths to establishing irreparable harm, all of which apply here: (1) the presumption of irreparable harm from civil rights violations (citing *Gibson v. U.S. I.N.S.*) (2) the unquantifiable nature of the opportunity lost (citing the rebuttable presumption of the Second Circuit) and (3) the "loss of human dignity" engender by violations of civil rights statutes, (citing *Gibson v. U.S. I.N.S*). Like the plaintiff in *Hernandez* who was "effectively denied the opportunity to serve as a public official," Ms. Doe faces denial of the opportunity to complete her doctoral studies and pursue legal academia—a harm that is similarly "undeniably difficult to quantify" and therefore presumptively irreparable—and as in *Hernandez* and *Gibson*, the harm to the Plaintiff in is grounded on the violation of a civil rights statue which is therefore presumptively a "loss of human dignity" that is also regarded as irreparable.

The specific irreparable harms Ms. Doe will suffer include:

### 1. Loss of Timely Academic Progress and Educational Disruption

As the *Du* ruling establishes, "the loss of timely academic progress alone is sufficient to establish irreparable harm." (*Du v. United States Dept. of Homeland Security*, 3:25-cv-644 at. 8, (D.Conn.)., quoting *Doe 1 v. Bondi,* 2025 WL 1188469*,* at \*4) Ms. Doe's termination from the program will cause immediate and lasting disruption to her academic progress. Reinstatement at a later date cannot cure this harm—she would lose an entire academic year, miss critical deadlines for teaching positions and academic job applications (which occur in the summer), and be unable to join classes or teaching assignments mid-year. As this Court recognized in *J.S.R.*, 330 F. Supp. 3d at 745, that some harms are "likely to continue even after [injunctive relief]" does not detract from the irreparable harm. Similarly, here, the academic and professional consequences of forced termination will persist even if Ms. Doe is later reinstated, but injunctive relief will bring about a quicker potential recovery from Defendants' discriminatory actions and prevent compounding harm from continuing discrimination.

Multiple courts have recognized that even temporary delays in professional advancement constitutes irreparable harm. See *D'Amico v. N.Y. State Bd. of Law Examiners*, 813 F. Supp. 217, 225 (W.D.N.Y. 1993) ("While plaintiff's injury is related to her ability to ... ... practice law and secure ... employment and income, it goes well beyond these monetary considerations. Plaintiff's injury is the result of ongoing discrimination based on her medical disability."); *Doe v. Samuel Merritt University*, 921 F. Supp. 2d 958, 963-64 (N.D. Cal. 2013) (inability to participate in clinical rotations and earn medical degree while lawsuit was pending constituted irreparable injury); *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011) ("[T]he district court did not err in concluding that Enyart would likely lose the chance to pursue her chosen profession."); *Bonnette v. D.C. Ct. of Appeals*, 796 F.

Supp. 2d 164, 186-87 (D.D.C. 2011) ("Because [plaintiff] cannot practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE deprives her of time to practice her chosen profession."); *Jones v. Nat'l Conf. of Bar Exam'rs*, 801 F. Supp. 2d 270, 286-87 (D. Vt. 2011) (delay will likely "exacerbate her harm as it may delay completion of her law school education and may delay her entry into her chosen professional field"). The delay to Ms. Doe's studies occasioned by the Defendants' illegal actions is irreparable harm.

### 2. Significant Deterioration of Medical Condition

The supplemental exhibits filed under seal demonstrate that Ms. Doe's treating physician expressly warns that if Ms. Doe is "removed from her program without being able to complete her studies in the 2025-2026 academic year, her condition will significantly deteriorate." Exh. L at 2. This is not speculation about past stress, but a medical opinion about future harm that will occur if the Court does not intervene to preserve the status quo.

Ms. Doe's treating physician has documented in multiple letters to Yale that the "uncertainty in academic standing" ███████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ This deterioration—which the physician confirms will "significantly" increase if Yale forces Ms. Doe out—cannot be adequately compensated with damages or undone by reinstatement at some later date.

As *Du* recognized, students' "anxiety and fear" in the face of forced removal from their educational programs "constitute[s] irreparable harm." *Du* at 7. This aligns with *J.S.R.*, where Judge Bolden found that psychological trauma constituted irreparable harm requiring injunctive relief. 330 F. Supp. 3d at 741. As in *J.S.R.*, where "every day adds to the gravity of their situation," *id.* at 740, here too, with the May 28 deadline rapidly approaching, every day

compounds Ms. Doe's harm. *See also Seaman v. Commonwealth of Virginia*, 3:22-cv-6 (W.D.

Va. March 23, 2022) at 3 ("[G]rave risks to Plaintiffs' health and their inability to access

education on account of these circumstances establish irreparable harms."). Notably, Ms. Doe's

request to Yale University for accommodations was grounded in part on ██████████████

██████████████████████████ she is, like the plaintiffs in *J.S.R.*, a person

likely to ███████████████ during the duration of the proceedings, which would

constitute irreparable harm.

### 3. Permanent Professional and Reputational Harm

Forcing dissertation submission prematurely would inflict lasting damage on Plaintiff's

scholarly identity and career prospects. A properly developed J.S.D. dissertation represents

publication-ready scholarship, refined through iterative faculty guidance. Yale's mandated

premature submission would produce an inferior work that, according to Yale's policy, is made

publicly accessible through Yale's library repository (Exh. A), serving as a lasting

misrepresentation of Plaintiff's scholarly capabilities.

This reputational injury creates an irremediable professional paradox: Plaintiff would

possess a terminal degree accompanied by demonstrably substandard scholarship—potentially

more damaging than having no doctoral credential at all. The professional stigma attached to

inferior dissertation work cannot be overcome through subsequent monetary compensation,

particularly in legal academia where scholarly reputation constitutes the fundamental

professional currency. Yale reports that it produced 23% of all law professors from 2016-2024.[2]

Since law professor hiring committees are comprised of law professors, this suggests that for

any given position Plaintiff applies to in her profession, the hiring committee will likely include

---

[2] https://law.yale.edu/admissions-financial-aid/jd-admissions/yale-law-school-numbers.

at least one Yale graduate. Given that law professors from Yale Law School serving on the hiring committees of other law schools will possess an insider awareness of the expected progress of a Yale J.S.D graduate, while also possessing potential knowledge of the perceived scandal of suing their own law school through alumni gossip networks, an interruption in Ms. Doe's progress will likely make it nearly impossible for her to secure employment as a law professor even if later reinstated.

The J.S.D. program's principal value resides in the structured faculty mentorship, education, teaching opportunities, scholarly development and publications that transforms doctoral candidates into recognized academic voices, not a degree that does not in and of itself credential a graduate for any further pursuits. Yale's denial of accommodations would sever Plaintiff's access to critical faculty guidance precisely when dissertation refinement is most crucial. This deprivation is particularly acute given Professor ███████ impending retirement, permanently foreclosing future faculty supervision opportunities.

As the Ninth Circuit recognized in *Enyart*, "the loss of the chance to engage in normal life activity, i.e., pursuing her chosen profession," and "professional stigma" constitute irreparable harm in ADA cases. 630 F.3d at 1165. In the legal academic market, where publication-quality and substantive faculty recommendations determine professional viability, premature termination would effectively close the doors to Plaintiff's intended academic career—a harm that extends well beyond the degree itself.

#### 4. Irreparable Loss of Dignity from Civil Rights Violations

The Second Circuit has found irreparable harm where losses are "not measurable entirely in monetary terms," *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1203 (2d Cir. 1970), such as where loss of an "ongoing business" represented "many years of effort and

the livelihood of its husband and wife owners," *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (per curiam); or where a wire service would lose customers if unable to continue supplying particular foreign news, *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908-09 (2d Cir. 1990). Civil rights cases present violations that are not measurable in monetary terms. Accordingly, and as established in *Hernandez*, "in cases where a plaintiff's civil rights have been violated, courts within the Second Circuit often apply a rebuttable presumption that irreparable injury exists because of the difficulty of quantifying the harm done to the plaintiff." *See also Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1208 (D. Conn. 1992) ("The court finds irreparable harm may be presumed in this case because ... the plaintiff has presented sufficient evidence to establish that its rights under the [Fair Housing] Act have been violated."); *Gibson v. U.S. I.N.S.*, 541 F. Supp. 131, 136 (S.D.N.Y. 1982) ("[W]here the statutory civil rights of employees [under Title VII] are found to have been violated, irreparable injury may be presumed from the loss of human dignity which such violations engender."); *Alameen v. Coughlin*, 892 F. Supp. 440, 447 (E.D.N.Y. 1995) (violation of RFRA substantially burdening individual's rights is irreparable harm).

Moreover, as *Hernandez* noted, the Supreme Court's decision in *Cummings* has made it "difficult, in many situations, for a plaintiff alleging a violation of Section 504 and Title II of the ADA to demonstrate entitlement to compensatory damages," making injunctive relief all the more essential. Without injunctive relief, Ms. Doe may not only have an inadequate remedy at law, but no remedy at law, for the most serious harms experienced absent injunctive relief.

Ms. Doe faces multiple forms of irreparable harm: loss of timely academic progress (observed in *Du*), denial of the opportunity to pursue her chosen profession (*Hernandez*), loss of

human dignity (*Hernandez* citing *Gibson*) and significant deterioration of her medical condition (*J.S.R.* and *Du;* reflected in Exh. L), permanent professional stigma (*Enyart*), and violation of her civil rights (*Hernandez*). These harms "cannot be remedied by the court upon conclusion of this case, nor via mere money damages." *Du*. Accordingly, Ms. Doe has demonstrated irreparable harm, and injunctive relief should issue.

## B.    Plaintiff is Likely to Succeed on the Merits of Her Claims

Plaintiff satisfies the elements for both Section 504 and ADA Title III claims. Yale does not dispute that Ms. Doe has disabilities substantially limiting major life activities, that she is otherwise qualified for the J.S.D. program, or that Yale receives federal funding and operates a place of public accommodation. See 29 U.S.C. § 794(a); 42 U.S.C. §§ 12181(7)(J), 12182(a). The only issue is whether Yale unlawfully violated its obligations to Plaintiff under Section 504 and the ADA.

### 1.    Yale Unlawfully Denied Doe Reasonable Accommodations.

Federal regulations explicitly state that "[m]odifications may include changes in the length of time permitted for the completion of degree requirements..." 34 C.F.R. § 104.44(a). Ms. Doe requested an extension through Spring 2026—a modification Yale's own Bulletin permits for students "demonstrating satisfactory academic progress." Exh. A at 78. At least two non-disabled students have received longer extensions. Yet Yale denied Ms. Doe's request through a series of procedurally and substantively deficient decisions. In the first and second denials, SAS Director McKeown stated only that Ms. Doe had "received multiple extensions" and her "faculty supervisor has denied your request." Exhs. E, F. Neither denial addressed whether the accommodation would fundamentally alter the program or impose an undue burden—the only legitimate grounds under federal law for denying accommodations.

Yale's Section 504 Coordinator, Mr. Thomas, found SAS's denial improper. Mr. Thomas reviewed Plaintiff's medical documentation showing her symptoms made it "'difficult or impossible ... to ███████████████████████████████████████ █████████████████████ Exh. C. He found the evidence failed to support any undue burden to Defendant, "as other students have been enrolled in the program for a longer period." *Id.* He "determined that SAS should reconsider your accommodation request through its interactive process." *Id.*

Despite this directive—which Yale's procedure mandate include meeting with the student (Exh. H)—McKeown issued two more denials without any communication with Plaintiff. The April 4 denial claimed an extension is "denied as it is not needed," because Ms. Doe's dissertation "only requires formatting." Additionally, it claimed that "your advisor has stated that he will not approve an extension and continue to serve in the role beyond this term . . . ." Exh. V.

Ms. McKeown's April 17 fourth denial, in defiance of Mr. Thomas's directive to engage in an interactive process included a new justification not offered in her three prior accommodation denial. It claimed Ms. Doe's dissertation was "submitted and satisfactory" and granting more time would be an "alternation to the program". Exh X. at 11. Again, the claims about Ms. Doe's dissertation were false. The April 1 submission was substantially identical to the January 6 draft, with added front matter explicitly stating it was incomplete (Chapter 4 unwritten, Chapters 2, 3, and 5 incomplete) and produced under protest per Mr. Thomas's advice. *See* Exh. S.

Yale's claim about "alteration" was also false. Yale cannot claim fundamental alteration when its own program contemplates extensions, other students routinely receive them, and

Yale's own Section 504 Coordinator—the official designated to ensure compliance with Section 504 as required by 34 CFR 104.7 § 104.7 (a)—determined the accommodation would not impose any burden. Yale's "alteration" claim was also its fourth justification for denying Ms. Doe an extension. Yale's shifting rationales (from "multiple extensions" to "faculty refusal" to "not needed" to "program alteration") and refusal to abide by the findings of its own legally required grievance procedure, suggests pretext for a preordained conclusion, not legitimate justification. Moreover, the third and fourth denials—coming after Yale's own Section 504 Coordinator directed Yale to engage in an interactive process—came without any interactive process despite the express directive to engage in one. McKeown's SAS did not even make a pro forma attempt to discuss the accommodation requests with Ms. Doe as required by its own policies. This is compelling evidence of legally prohibited discrimination through failure to provide reasonable accommodations. See *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276–78 (2d Cir. 2003) (finding that a plaintiff can state a claim under the ADA and Section 504 for failure to provide reasonable accommodation, even absent a theory of disparate impact).

The notion that granting one additional year would "alter" the program is also belied by Yale's routine practice. At least two non-disabled J.S.D. students have remained enrolled longer than Ms. Doe, with one already extended through 2026, as the Section 504 Coordinator recognized in rejecting Yale's first and second denials of Ms. Doe's accommodation. Yale did not consider its program "altered" by the extensions for other students. Indeed, Yale's third denial of Doe stated that each extension is considered on a case-by-case basis, suggesting that an extension for one student does not fundamentally alter the program as a whole. Silverstein acknowledged that extended enrollment is a normal "courtesy" in this program. Yale cannot claim fundamental alteration for an accommodation it already provides to non-disabled students

as a matter of course. McKeown likewise, cannot, on her fourth attempt to articulate a legally

cognizable basis for denying an accommodation request, claim that continuing enrollment after

submitting a draft thesis, a submission which was compelled by her office's refusal to properly

consider an extension to that submission, can constitute a post-hoc alteration to the program:

doing so is a means of redefining the benefit of the program so as to exclude a disabled student.

See *Alexander v. Choate*, 469 U.S. 287, 301, ("[A]n otherwise qualified handicapped individual

must be provided with meaningful access to the benefit that the grantee offers. The benefit

itself, of course, cannot be defined in a way that effectively denies otherwise qualified

handicapped individuals the meaningful access to which they are entitled; to assure meaningful

access, reasonable accommodations in the grantee's program or benefit may have to be made.")

Deferring to a faculty member's personal refusal to accommodate is likewise improper—

it is the institution's duty under the law to provide accommodations, regardless of one

professor's preference. This is precisely why institutions have disability services offices: to

ensure compliance with federal law rather than leaving it to individual faculty discretion.

### 2.    Yale Denied Doe an Effective Section 504 Grievance Procedure.

Federal regulations require recipients of federal funding to "adopt grievance procedures

that incorporate appropriate due process standards and that provide for the prompt and equitable

resolution of complaints alleging any action prohibited by" Section 504. 34 C.F.R. § 104.7(b).

Despite Plaintiff's March 12 accommodation request, two favorable rulings from Yale's Section

504 Coordinator, and multiple appeals through every available channel, Yale has provided no

remedy. Plaintiff filed her accommodation request over two months ago. Yale's Section 504

Coordinator twice directed SAS to grant relief. SAS, through McKeown, defied this directive

both times. When Plaintiff sought enforcement of these directives, Yale's Section 504

Coordinator told her he didn't know what to do. The only remaining procedure—a several month investigation (Exh. X)—would conclude months after Yale terminates her enrollment on May 28 (Exh. P). This breakdown of Yale's grievance procedures constitutes both an independent violation of Section 504 and compelling evidence that Plaintiff will succeed on her discrimination claims—while demonstrating why judicial intervention is her only avenue to prevent ongoing harm.

When Plaintiff submitted her accommodation request on March 12, 2025, SAS Director McKeown denied it within one week. Exh. E. Her denial stated only that Plaintiff had "received multiple extensions" and her "faculty supervisor has denied your request." Exh. E. She never addressed whether the accommodation would fundamentally alter the program or impose an undue burden—the only permissible grounds for denial under federal law. When Plaintiff asked for the legal basis, McKeown simply repeated: "you have received multiple extensions." Exh. F.

Plaintiff appealed to Yale's Office of Institutional Equity and Accessibility (OIEA). On April 1, 2025, Jamaal Thomas, Yale's Deputy ADA Coordinator and Section 504 Compliance Officer, sustained her appeal: "The information I learned during this review does not suggest that the requested accommodations to extend your JSD candidacy or to extend the deadline for final submission of your thesis would present an undue hardship, financial or administrative burden to the institution, as other students have been enrolled in the program for a longer period.... As a result of this review, I have determined that SAS should reconsider your accommodation request through its interactive process." Exh. C.

Mr. Thomas found that SAS had failed to justify its denial and directed SAS to follow Yale's interactive process—which requires meeting with the student to discuss accommodations. Exh. H. Three days later, McKeown defied this directive. Without any

meeting or communication with Plaintiff, she issued another denial claiming Plaintiff's dissertation "only requires formatting" and an extension was "not needed." Exh. V. After Mr. Thomas issued a second, more detailed directive on April 14, 2025 (Exh. I), McKeown again refused to comply. Her April 17 denial offered new rationales—the dissertation was "submitted and satisfactory" and an extension would "alter" the program, even though Ms. Doe's dissertation explicitly stated it was incomplete and produced under protest and Yale had granted extensions to other students who were not disabled.

When Plaintiff reported McKeown's defiance, Mr. Thomas emailed that he was not sure how to proceed (Exh. X at 9). Weeks later, he suggested filing a complaint with OIEA Deputy Director Alexa Lindauer (Exh. X at 7). But Lindauer said any investigation would take months—long after Plaintiff's termination date. Exh. Y. Plaintiff then tried Yale Law School's internal procedures, filing a complaint against Defendant Silverstein. Associate Dean Monica Maldonado refused to address it, claiming the procedures didn't apply to administrators. Exh. Y at 1-2. This May 14, 2025 decision exhausted Plaintiff's internal options.

The seminal case of *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 135-36 (D. Mass. 1997), found a Section 504 violation where a university offered "no meaningful 'appellate' review of a decision to reject a requested accommodation." The court condemned an appeals process that had "the effect of asking the same official to reconsider his own denial." Yale's process was worse. The appeals officer vindicated Plaintiff's request, but his subordinate ignored him. Yale offered no way to enforce its own Section 504 Coordinator's decisions. When the coordinator himself couldn't figure out what to do, the process collapsed entirely.

A grievance procedure that permits open defiance of the 34 C.F.R. § 104.7(a) designated employee's decisions regarding the outcome of grievences, provides no enforcement

mechanism, and offers only a multi-month investigation when termination months into the initial complaint fails the regulatory mandate for "prompt and equitable resolution." 34 C.F.R. § 104.7(b). Yale's systematic failure—from McKeown's refusal to apply the proper legal standard, to her defiance of direct orders, to the absence of any remedy—establishes a Section 504 violation. This legally impermissible procedural breakdown, independent of the unlawful denial of reasonable accommodations, shows a likelihood that Plaintiff will likely prevail on her Section 504 and ADA claims.

### 3. Yale Retaliated Against Doe in Violation of Section 504 and the ADA

Both Section 504 and the ADA incorporate broad anti-retaliation protections. See 29 U.S.C. § 794(d) (incorporating ADA retaliation provision); 42 U.S.C. § 12203 (ADA retaliation). They are generally governed by the same standard. *See Davis v. Power Auth.*, No. 22-488, 2023 WL 3064705, at *2 (2d Cir. Apr. 25, 2023) (summary order).

The elements of a retaliation claim under Section 504 and the ADA are: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that [the] plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against [the] plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002). Protected activity includes, for example, "actions taken to report, oppose or protest unlawful discrimination, including complaints of discrimination to the employer, and the filing and pursuit of administrative charges." *Gaidasz v. Genesee Valley Bd. of Co-op. Educ. Sys. (Boces)*, 791 F. Supp. 2d 332, 339 (W.D.N.Y. 2011). Requests for accommodations also constitute protected activity. *Weixel*, 287 F.3d at 149.

Here, the evidence of retaliation is compelling.

*a.    Plaintiff engaged in protected activity.*

Plaintiff's record of protected activity is documented in contemporaneous correspondence. On March 14, 2020, Plaintiff notified Assistant Dean Gordon Silverstein—copying the Director and Assistant Director of Graduate Studies—that the circumstances created by the pandemic would predictably worsen her ████████████ and impede her research. In the following months she repeatedly invoked her need for accommodation, notifying Silverstein on August 10, 2020 and October 5, 2020 that her exclusion from library space, despite Yale's decision to permit a subset of students continued access, left her unable to make any dissertation progress.

On January 13, 2021, Defendant Silverstein threatened expulsion unless she produced a complete dissertation draft by May 21, 2021. Plaintiff objected in writing on January 14, 2021, explaining the demand was "ultra vires, discriminatory, and impossible in light of her disability." She reiterated these objections in emails of January 16, 2021, May 4, 2021, and throughout the 2021-22 academic year while twice requesting leave on disability grounds to the appropriate staff member within Defendant Silverstein's Graduate Programs office. Plaintiff's leave requests were acknowledged as received but never acted upon.

In April 2024, Plaintiff sought a SAS extension to file her progress report with Defendant Silverstein's Graduate Program Office while reforming her faculty committee. Defendant McKeown denied this request on April 18, 2024, Exh. K, citing preferences expressed by Defendant Silverstein's office.

Plaintiff's protected activity culminated in an in-person conversation on December 23, 2024, where she told Silverstein that his imposition of individuated deadlines was damaging her ability to participate in her educational program, that she believed they were discriminatory, and

that she intended to file a complaint. Compl. ¶ 35. The next day, December 24, 2024, she issued

a litigation-hold notice to Yale's General Counsel. Exh. 2A. In January 2025, she lodged a

formal Section 504/ADA grievance with Yale's OIEA detailing Silverstein's conduct and

requesting mediation. Exh. 2B.

> b.    *Yale took adverse actions against Plaintiff*

When Plaintiff requested an administrative extension on May 4, 2021, Silverstein

circumvented their agreed private process by contacting her dissertation chair without her

knowledge, disclosing personal information about Plaintiff, and procuring an email conditioning

any extension on finishing within a single year. Following her Summer 2022 SAS request,

Silverstein granted only a brief administrative extension but imposed an idiosyncratic

requirement that she submit a non-dissertation paper to him personally by December 6, 2022,

under threat of withdrawal—a practice not found in the Yale Law School Bulletin or any

published policy.

On April 22, 2024—four days after McKeown denied Plaintiff's April 18

accommodation request—Silverstein issued this ultimatum: "In light of the decision by the

Student Accessibility office against requesting any additional accommodations—we need to

move forward... If I do not receive your comprehensive progress report by and the confirmation

from ███████████ or another senior faculty member by Wednesday, May 1, 2024, you will

be administratively withdrawn from the JSD program." Exh. Z.

When Plaintiff responded by securing ████████████████ written agreement to

supervise her dissertation on April 23, 2024, Silverstein intervened, causing ████████yn to

retract his offer the same day. Compl. ¶¶ 26-27; Exh. R. When Plaintiff eventually re-secured

████████ as supervisor, Silverstein imposed the January 6 and April 1, 2025 deadlines—requirements applied to no other J.S.D. student. Compl. ¶ 29.

After Plaintiff told Silverstein on December 23, 2024 that she would file a complaint, he declared he was "disinclined" to extend her candidacy. Compl. ¶ 35. Following her December 24 litigation hold notice and January 2025 OIEA complaint, Silverstein preemptively appealed to the Yale Law School Dean's Office's adoption of his deadlines. This adverse action had the effect of stripping OIEA of remedial authority over Silverstein's conduct, predictably discouraging a complainant Compl. ¶ 39.

When Plaintiff's Section 504 grievance was sustained on April 1, 2025, Defendant McKeown issued her third denial on April 4—without the interactive process required by Mr. Thomas. After Plaintiff complained on April 28, 2025 that Silverstein had circulated her incomplete draft without permission, Silverstein responded on May 1 with an ultimatum cc'ing the Dean: accept forced graduation or withdraw and forfeit both student and alumni privileges from her 2015 Yale Law degree.

> c.    *The causal connection is clear.*

The temporal proximity between the protected activity and the adverse action, Yale's deviation from its own policies and procedures, the admissions of its own employees, its shifting rationales for its decisions, and its disparate treatment of Plaintiff versus other students all provide clear support for a causal connection.

The chronology alone establishes temporal proximity sufficient for causation. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("[T]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); *Treglia v. Town of Manlius*, 313 F.3d 713,

720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse actions can be sufficient to establish causation." (*citing Cifra*, 252 F.3d at 217)). Silverstein's April 22, 2024 threat came four days after Plaintiff's accommodation request was denied—and explicitly cited that denial as the reason to "move forward." His December 23, 2024 refusal came immediately after Plaintiff called his actions discriminatory. His May 1, 2025 threat came three days after her complaint about unauthorized circulation.

The Bulletin permits extensions for students "demonstrating satisfactory academic progress" and grants two terms to find a replacement supervisor. Exh. A at 78. Yet Silverstein gave Plaintiff one week to find a new advisor, imposed deadlines found nowhere in Yale's policies, and required personal submission of a non-dissertation paper—requirements applied to no other student. Then, when McKeown defied directives from Yale's Section 504 Coordinator—twice—she violated Yale's own grievance procedures, and failed to follow Yale's own policies on engaging in an interactive process. Deviation from ordinary policies supports a finding of retaliatory pretext, separate from temporal proximity. *See, e.g.*, *Dartt v. Browning-Ferris Industries, Inc.*, 427 Mass. 1, 17 (1998) ("evidence that BFI may have deviated from its normal management procedures when it summarily terminated Dartt could support a reasonable inference that BFI had terminated Dartt because of his perceived handicap"); *Kouvchinov v. Parametric Tech*, 537 F.3d 62, 68 (1st Cir. 2008) ("pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices"). The words of Yale's own employees supply direct evidence. Silverstein told Plaintiff "If I wanted you gone, you'd be gone," and explained how he avoids records by "pick[ing] up the phone." His April 22 email explicitly linked adverse action to protected

activity: "In light of" the SAS decision, he would withdraw her. Meanwhile, Yale's Section 504 Coordinator found that "other students have been enrolled in the program for a longer period" and that the requested accommodations would not "present an undue hardship, financial or administrative burden to the institution." Exh. C. After McKeown defied this directive, the Section 504 Coordinator told Plaintiff he was "not sure how to proceed"—an admission that Yale's own procedures had broken down. When he later discovered that Silverstein had secured the Dean's Office's adoption of his deadlines, he confirmed this "stripped OIEA of its remedial authority." Compl. ¶ 39.

Yale's shifting explanations compound the evidence of pretext. McKeown offered four different rationales for denying accommodations: "multiple extensions," "advisor refusal," "not needed," and "program alteration." Each rationale contradicted the last. The "multiple extensions" rationale ignored that non-disabled students received more extensions. The "advisor refusal" rationale violated Yale's policy requiring institutional—not individual faculty—accommodation decisions. The "not needed" rationale relied on false claims about Plaintiff's dissertation being complete. The "program alteration" rationale came only after Yale's own Section 504 Coordinator found no such alteration would occur. "A plaintiff may prove that retaliation was a but-for cause . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the . . . proffered legitimate, nonretaliatory reasons for its action . . . ." *Zann Kwan v. Andalez Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *see also Olivier v. Cty. of Rockland*, 15-cv-8337 (S.D.N.Y. June 17, 2019); *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

The extraordinary measures applied only to Plaintiff—personal paper submissions, compressed deadlines, supervisor vetoes, alumni status revocation—are without precedent in

the J.S.D. program. This disparate treatment, combined with the procedural violations, supplies powerful evidence of retaliatory motive. *Olivier, supra*, n. 34 ("Plaintiffs certainly may use evidence of similarly situated comparators who were treated differently as evidence of pretext."). Here the fact there are similarly situated comparators who did not engage in protected activity who are being allowed to remain in the program for a longer time than Ms. Doe is powerful evidence establishing pretext.

The Ninth Circuit's decision in *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1231 (9th Cir. 2012), is instructive. There, the court reversed summary judgment where a doctoral student alleged retaliation after her advisor resigned following her bias complaints and the university failed to help her secure a replacement. The court found the university's "inaction in failing to help her secure an advisor" sufficient to support retaliation. *Id.* Silverstein went beyond inaction by blocking Plaintiff's new advisor, imposed ad hoc requirements and threatened to strip previously earned privileges. Targeting a student who after they request accommodations and file complaints immediately after the protected activity suggests retaliation.

### C. The Balance of Hardships Tips Decidedly in Plaintiff's Favor

The balance of hardships strongly favors Plaintiff. If the preliminary injunction is granted, Yale would only need maintain Plaintiff's current enrollment status while the litigation proceeds. This imposes minimal administrative burden on Yale and requires minimal financial expenditure, as Plaintiff is not seeking fellowship funding. In contrast, if the injunction is denied, Plaintiff faces devastating and permanent harm to her academic career and psychological wellbeing. The disparity between the minimal inconvenience to Yale and the catastrophic harm to Plaintiff clearly tips the balance in Plaintiff's favor. Yale would suffer no meaningful harm from maintaining a student's enrollment status for a short additional period—

in fact, their own Section 504 coordinator found that it was required on April 1—while Plaintiff would suffer life-altering consequences if forced out of the program before the merits of her claims can be adjudicated.

Defendants might argue they have an interest in enforcing academic deadlines or maintaining "standards." But granting this injunction does not lower any standard – Ms. Doe will still have to produce a dissertation meeting Yale's criteria. Yale's only conceivable "harm" is that one of its many students will take additional time to finish. That is not a cognizable harm, and certainly not one that outweighs the catastrophic harm to Plaintiff if she is not allowed that time. Allowing Ms. Doe to remain enrolled poses no threat to Yale's academic integrity – if anything, it furthers Yale's educational mission by ensuring a qualified student can successfully complete her work.

A preliminary injunction would preserve the status quo. Ms. Doe is currently (up until May 28) a registered student; the injunction would keep her in that status. When the injunction sought is prohibitory and maintains the status quo, the balance of equities leans toward granting relief, especially to prevent irreparable harm. Here, maintaining the status quo means keeping a student enrolled rather than abruptly terminating her. Denying injunctive relief, however, would upset the status quo by allowing Yale to remove Ms. Doe from its rolls before the Court can adjudicate her claims.

### D.    A Preliminary Injunction Will Serve the Public Interest

Granting a preliminary injunction would serve the public interest in several ways:

First, there is a strong public interest in eradicating discrimination and ensuring equal educational opportunities for individuals with disabilities. Congress declared in the ADA that "the Nation's proper goals" include assuring "full participation, independent living, and

economic self-sufficiency" for people with disabilities, and that the elimination of discrimination is a national priority. 42 U.S.C. §§ 12101(a)(7), (8). Granting an injunction upholding Ms. Doe's rights under the ADA and Section 504 directly advances this public interest by ensuring that the institution must complies with disability laws and provide equal access. This benefits not only Ms. Doe but other current and future students who might otherwise be deterred from requesting accommodations. The public is well-served when our educational institutions are held to the standards of fairness and inclusion that the law requires.

Second, the public has an interest in schools following their own policies and honoring commitments to students. If a university advertises certain procedures or safeguards (like Yale's extension and supervisor substitution policies) and then does not follow them, it undermines trust in higher education generally. Enforcing Yale's compliance with its Bulletin via injunction promotes integrity in educational administration.

Third, there is a public interest in preventing waste of educational investments. Significant resources – personal, institutional, and public (through federal funding) – have been spent on Ms. Doe's education thus far. If she is forced out now, those resources are wasted. By contrast, allowing her the short additional period to finish her degree salvages that investment.

Fourth, the public health and welfare considerations favor an injunction. The Court's intervention will prevent the severe ███████ harm that would befall Ms. Doe if expelled. While the immediate beneficiary is Ms. Doe, there is a broader principle: supporting the ████ health of students and not exacerbating ██████ health crises is a public interest, especially amidst increasing awareness of student ██████ health challenges. An injunction aligns with the public interest in humane and non-discriminatory treatment of people with disabilities.

Fifth, granting the injunction will ensure that Ms. Doe's legal claims can be adjudicated on their merits, rather than effectively mooted by the passage of time. There is a public interest in having courts decide substantial questions of disability rights in higher education rather than letting them evade review. If Yale were allowed to "run out the clock" on Ms. Doe's enrollment, her claims for injunctive relief could become moot (since after losing student status, certain remedies like reinstatement under ADA Title III might no longer be available). That would undermine enforcement of the law. By preserving the status quo, the injunction enables the judicial process to function and upholds the rule of law.

Finally, it must be noted that an injunction here will not adversely affect any countervailing public interest. No innocent third parties will be harmed by Ms. Doe continuing her studies. The public interest in academic standards will not be harmed – Ms. Doe seeks to meet those standards with a reasonable accommodation, and enjoining Yale from its rigid stance actually promotes genuine academic achievement (a thoroughly researched dissertation) as opposed to a rushed formality. Yale cannot claim any legitimate interest in continuing practices that violate federal law. If the Court finds (as is likely) that Ms. Doe has shown a likelihood of success on her ADA and Rehab Act claims, then enforcing compliance with those laws is in the public interest. *See, e.g.*, *Bartell v. Grifols Shared Services NA, Inc*., 618 F. Supp. 3d 275 (M.D.N.C. 2022) ("[T]he public interest lies with upholding the law and having the mandates of the ADA and Rehabilitation Act enforced."); *Marlo M. ex rel. Parris v. Cansler*, 679 F.Supp.2d 635, 638 (E.D.N.C. 2010) (same)*.* In conclusion, every public interest factor points toward issuance of the injunction. Upholding anti-discrimination principles, supporting educational attainment, and maintaining the status quo so that legal rights are not nullified by timing – all these favor Plaintiff.

Rule 65(c) of the Federal Rules of Civil Procedure provides in part that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." "Although the rule speaks in mandatory terms, an exception to the bond requirement has been crafted for, inter alia, cases involving the enforcement of 'public interests' arising out of 'comprehensive federal health and welfare statutes.'" *Pharmaceutical Soc. of NY v. Dept. of Social Ser.*, 50 F. 3d 1168, 1174-75 (2d Cir. 1995). Because this case is brought under the ADA and Section 504 and an injunction is in the public interest, the bond requirement of Rule 65 should be waived.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court issue a temporary restraining order immediately until a hearing can be held on a motion for preliminary injunction seeking the same relief:

1.  Prohibiting Defendants from removing Plaintiff from her doctoral program or otherwise terminating her status as a doctoral candidate at Yale University during the pendency of this litigation, whether termed a "graduation," withdrawal or expulsion;

2.  Requiring Defendants to maintain Plaintiff's enrollment status through the end of the Spring 2026 semester; and

3.  Such other and further relief as the Court deems just and proper.

Respectfully Submitted,

PLAINTIFF

By:_____/s/_____
Alexander T. Taubes, Esq.
Federal Bar No.: ct30100
Alexander T. Taubes
470 James Street, Suite 007
New Haven, CT 06513
(203) 909-0048
alextt@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2025, a copy of the foregoing Renewed Motion for Temporary Restraining Order and Preliminary Injunction was served on all Defendants by e-mail to their counsel prior to filing. This motion will be filed under seal and notice of filing will also be served through counsel of record via the Court's CM/ECF electronic filing system. This certification is made pursuant to Fed. R. Civ. P. 65(b)(1)(B) to confirm that Defendants have received notice of the within motion and the relief sought herein.

/s/Alexander T. Taubes

## TABLE OF EXHIBITS*

| Ex. | Description | Date |
|-----|-------------|------|
| A | Excerpt from *Yale Law School Academic Bulletin* (J.S.D. policies on extensions, supervision, and thesis submission) | Current edition |
| B | Email from Deputy ADA/§ 504 Coordinator Jamaal Thomas confirming students may rely on Bulletin policies | Feb. 6 2025 |
| C | Email with decision by § 504 Coordinator sustaining Doe's appeal and noting two comparator students with longer enrollment | Apr. 1 2025 |
| D | Plaintiff's formal accommodation request to Student Accessibility Services (SAS) | Mar. 12 2025 |
| E | SAS denial of accommodation request (McKeown) | Mar. 19 2025 |
| F | Follow-up email from McKeown reiterating denial without legal basis | Mar. 27 2025 |
| G | Plaintiff's § 504/ADA grievance/appeal filed with OIEA | Mar. 29 2025 |
| H | Yale SAS "Interactive Process" policy print-out | Undated (web) |
| I | Detailed OIEA memorandum (back-dated "Apr. 1 2025"; emailed Apr. 14 2025) directing SAS to reconsider accommodations | Apr. 14 2025 |
| J | Email transmitting OIEA memorandum (showing date) | Apr. 14 2025 |
| K | SAS denial of Doe's request despite OIEA decision, citing preferences from Silverstein's office | Apr. 18 2024 |

| Ex. | Description | Date |
|-----|-------------|------|
| L | Treating physician letter describing risk of significant deterioration if Doe is removed from program | May 20 2025 |
| M | Treating physician letter supporting need for accommodation | Mar. 11 2025 |
| N | Treating physician follow-up letter | Mar. 26 2025 |
| O | Treating physician follow-up letter | Mar. 27 2025 |
| P | Email from Registrar Heather Abbott confirming degrees confer May 28 2025 | May 20 2025 |
| Q | Email from Silverstein imposing Jan 6 / Apr 1 dissertation deadlines | Jun. 11 2024 |
| R | Plaintiff's response "under protest" to Silverstein's deadlines | Jun. 14 2024 |
| S | Apr. 1 2025 thesis draft (front matter noting incompleteness and protest) | Apr. 1 2025 |
| T | Annual Progress Report citing Bulletin right to two terms to secure new supervisor | Apr. 2025 |
| U | Yale Section 504 grievance-procedure brochure / form | Undated |
| V | Third SAS denial email (no interactive process) | Apr. 4 2025 |
| W | Fourth SAS denial letter claiming "program alteration" | Apr. 17 2025 |
| X | Email thread (Apr. 17–May 2025) with Thomas & Lindauer showing breakdown of grievance process | Apr.–May 2025 |
| Y | Complaint to Dean's Office (May 6 2025) and Associate Dean Maldonado's response (May 14 2025) | May 6 & 14 2025 |
| Z | Silverstein ultimatum re advisor & ███ retraction emails | Apr. 22–23 2024 |
| 2A | Litigation-hold notice sent to Yale Office of General Counsel | Dec. 24 2024 |
| 2B | Formal OIEA complaint concerning Silverstein's conduct | Jan. 10 2025 |

   *Unredacted versions of the Exhibits are being served on Defendants prior to filing and are being filed under seal. Redacted versions of the Exhibits and this Motion will be filed on the public docket.*