**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JANE DOE,
        *Plaintiff*,

        v.                                    No. 3:25-cv-787 (OAW)

YALE UNIVERSITY, et. al.,
        *Defendants.*

**RULING DENYING PRELIMINARY INJUNCTION**

This matter is before the court upon Plaintiff's motion for a preliminary injunction (the "Motion"). ECF No. 32. The court has reviewed the Motion, Defendants' response thereto, *see* ECF No. 43, Plaintiff's reply, *see* ECF No. 49, and all exhibits and the record in this matter and is thoroughly advised in the premises. Additionally, on June 10, 2025, the court heard oral argument from the parties at a contested hearing. For the reasons discussed herein, the court **DENIES** Plaintiff a preliminary injunction.

I.    **BACKGROUND**

Despite there being no true factual dispute in this case, the narratives presented by the parties paint very different pictures of the circumstances giving rise to this action. A more detailed recount of the parties' alleged facts is provided in the discussion below, but broadly stated, Plaintiff currently is enrolled as a graduate student in the J.S.D. program at Yale Law School ("YLS"). She suffers from certain conditions that no one disputes render her disabled within the meaning of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). She has sought certain

accommodations from Defendants on account of those disabilities, the most important of which is an extension of time through the 2025-2026 academic year to complete her dissertation, which is a requirement for her degree. Defendants have denied these accommodations.

After exhausting internal administrative avenues for relief, Plaintiff brought this action, asserting violations of the ADA and Section 504.[1] More specifically, she accuses Defendants of retaliating against her, of failing to provide accommodations to which she was lawfully entitled, and of failing to have a process for accommodating disabilities that satisfies relevant regulations.

Plaintiff sought, and was granted, a temporary restraining order prohibiting Yale from discharging her from the program, which was scheduled (or threatened, depending upon whom one asks) to occur on May 28, 2025. The court held a hearing on whether to convert the temporary restraining order into a preliminary injunction, at which both parties presented argument and Defendants called witnesses to testify.

The court has considered all briefs, exhibits, live testimony, and arguments from counsel in arriving at this ruling.

## II.  <u>LEGAL STANDARD</u>

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, 26 (2d Cir. 2018) (summary order) (quoting *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007)) (per

---

[1] She also asserts a claim for breach of contract, which she does not argue is a predicate claim for injunctive relief, and so the court will disregard that claim herein.

curiam) (alteration and emphasis in original) (internal quotation marks omitted).  To carry this burden, Plaintiffs must show (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable injury in the absence of an injunction, (3) that the balance of hardships tips in Plaintiffs' favor, and (4) that the public interest "would not be disserved" by the issuance of an injunction.  *Id.* (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)) (internal quotation marks omitted).  In determining whether to grant this extraordinary relief, courts may consider hearsay evidence.  *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

## III.    DISCUSSION

There are a few preliminary points the court will address before delving into the substance of the Motion.  First, the court first must dispel the misconception that the granting of the temporary restraining order all but guarantees the granting of a preliminary injunction.  A preliminary injunction is "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiff is correct that the standards for obtaining a temporary restraining order and for obtaining a preliminary injunction are the same.  But "[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction."  *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter*, AFL-CIO, 306 F.2d 840, 842 (2d Cir. 1962).  Thus, while the standard is the same, the posture of the case is fundamentally different.

One key distinction is that a temporary restraining order very often is issued ex parte, without even an opportunity for the restrained party to respond.  And while, as a

technical matter, Defendants did respond to the motion for a temporary restraining order, that response was so cursory (as might be expected given the time constraints always associated with temporary restraining orders) that, as a practical matter, the record represented only Plaintiff's arguments.   Accordingly, the court finds that Plaintiff overstates the weight of the still-active temporary restraining order when she asserts that Defendants can only succeed in their opposition by arguing that the balance of hardships weighs in their favor.  To the contrary, the court must reevaluate all the elements of the relevant test, this time with the benefit of Defendants' fulsome response.

Second, the court is obligated to "inquire as to subject matter jurisdiction and satisfy itself that such jurisdiction exists."  *DeVito Verdi, Inc. v. Legal Sea Foods, Inc.*, No. 1:21-CV-1007-MKV, 2021 WL 1600088, at *1 (S.D.N.Y. Apr. 23, 2021) (quoting *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361–62 (2d Cir. 2000)).  One limitation placed upon federal jurisdiction is that federal courts may only hear cases and controversies, which in turn requires a litigant to show they have standing to bring their claims.  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) ("[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "[T]he standing issue 'may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . . .'"  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)).

There are three components to establishing standing: Plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *SM Kids,*

*LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).  In her complaint, and again at oral argument, Plaintiff asserted that Yale has violated Section 504 by failing to implement effective grievance procedures.  It is undisputed that Yale's Student Accessibility Services ("SAS") accepts and reviews requests for accommodations from students with disabilities. Students whose requests are denied by SAS have the option to grieve the denial to Yale's Office of Institutional Equity and Accessibility ("OIEA").  It also is undisputed that OIEA only has the authority to make recommendations to SAS.  OIEA has no authority to reverse SAS's decisions, or even enforce its own recommendations upon SAS.  Plaintiff asserts that this renders Yale's grievance process ineffective to satisfy Section 504 regulations.  *See* 34 C.F.R. § 104.7(b) (requiring covered entities to "adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by this part.").

But even assuming that Plaintiff's argument has merit, she cannot show that she suffered any injury in fact as a result of this violation.  The facts presented by the parties show that (1) Plaintiff submitted a formal request for an accommodation to SAS; (2) SAS denied that request; (3) Plaintiff grieved the denial to OIEA; (4) OIEA recommended that SAS reconsider that denial; and (5) *SAS did reconsider the denial in accordance with OIEA's recommendation*.  Thus, even if Section 504 does require Yale to endow OIEA with some enforcement authority (and for clarity, the court takes no position on that proposition), that requirement would have no applicability here because SAS voluntarily complied with OIEA's recommendation: Plaintiff's request was reconsidered.  That the request still was denied may support other claims Plaintiff brings in this action, but it cannot support a claim for an ineffective grievance process.  Accordingly, the court

concludes that Plaintiff does not have standing to bring this particular Section 504 claim, and it must be dismissed.

And finally, the court rejects Defendants' argument that Plaintiff's motion for a preliminary injunction is untimely.  They contend that because Plaintiff knew for almost a year that her candidacy was ending in May 2025, she ought to have sought relief much earlier than that month.  The court finds that Plaintiff's attempts to secure relief via Yale's own grievance procedure was reason enough to delay filing suit.  Her claims might not have been ripe any earlier.

The court turns now to the remaining claims upon which Plaintiff seeks injunctive relief: failure to accommodate and retaliation, both pursuant to both the ADA and Section 504.  To show the former, Plaintiff must allege: (1) that she is a "qualified individual" under both statutes; (2) that Defendants are subject to the ADA and, for the Section 504 claim, that they are federally funded; and (3) that she was denied the opportunity to participate in Board activities by reason of her disabilities.  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).  And as to the latter, "[t]he elements of a retaliation claim under either [Section 504] or the ADA are (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."  *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)) (alterations added).

There is no dispute that Plaintiff is a "qualified individual," or that Defendants are subject to both the ADA and Section 504.  Thus, as to the failure to accommodate claim,

the only point in contention is whether Plaintiff was denied the opportunity to participate in her program by reason of her disability. All elements of the retaliation claim appear to be in dispute.

Here, the court finds it most effective to recount the details of each party's narrative in the context of these elements.

Certain aspects of the J.S.D. program require discussion, for context. The J.S.D. program is a follow-on course of study to the LL.M. program, and all the coursework required for completion of the J.S.D. program is covered during the LL.M. program. ECF No. 30-1 at 1.[2] The policies governing this course of study contemplate that students will complete the program by May 1 of the fifth year after their enrollment. *See id.* However, students may be granted extensions of time to complete the program requirements provided that they are progressing academically and that they have the support of their faculty advisor. *Id.* There is no stated limit on the number of extensions a student may be granted, and there are no other deadlines laid out in the policies (though there also is nothing in the policies stating that other deadlines may not be imposed). This extension process is entirely separate from the SAS accommodation process.

Plaintiff entered the J.S.D. program in 2016.[3] Email communication between Plaintiff and her faculty advisor, Gideon Yaffe,[4] indicate that as early as 2018, Plaintiff was being encouraged to focus on the completion of the J.S.D. program requirements

---

[2] Citations to the parties' exhibits will refer to the page number assigned by the court's electronic filing system, as the exhibits otherwise have no internal pagination.

[3] Defendants' account of events starts years earlier, when Plaintiff first began her association with Yale in other capacities, but it is not clear that Plaintiff disclosed her disabilities during that period, or that she requested any accommodations. Accordingly, the court finds any events before Plaintiff's enrollment in the J.S.D. program to be irrelevant to this discussion.

[4] The court notes that the name of Plaintiff's faculty advisor was disclosed at the hearing and now is part of the public record.

(*i.e.*, her dissertation).  ECF No. 43-1 at 30.[5]  Professor Yaffe, believed that she should be able to complete the program within the five years allotted by the policy.  At one point it appeared that Plaintiff might finish her dissertation in the Spring 2020 semester.  ECF No. 43-1 at 79.

However, the COVID-19 pandemic exacerbated her conditions and hindered her ability to work on her thesis.  J.S.D. students generally are permitted to spend two years of their candidacy "in residence" at Yale, which is to say, they may spend two years with the same access to campus enjoyed by regularly-enrolled students.  But by the time the pandemic struck, Plaintiff already had spent two years in residence, and Yale's pandemic protocols effectively excluded anyone not "in residence" from campus.  Plaintiff contends that for the period that these restrictions were in place (which period the parties dispute, but which dispute need not be resolved here), she was completely barred from campus and, consequently, from those resources that might have alleviated her condition and allowed her to continue progressing on her dissertation.  She considers herself to have been "constructively" placed on leave for that period.  ECF No. 43-2 at 82.

By Spring 2020, Defendant Silverstein, the Assistant Dean for Graduate Programs at YLS, was aware of Plaintiff's personal struggles.  The record contains email correspondence in which Plaintiff makes clear to him that her "psycho-social" needs are not being met, and she asks him to address those needs by permitting her access to parts of campus.  *Id.* at 22.  He conceded that the COVID restrictions affected Plaintiff (and

---

[5] In spring of 2020, she admits to having thought that she might finish her dissertation but avoid submitting it, so that she could retain eligibility for teaching assistantships another year.  When her advisor instead opined that she should complete the dissertation and get a paying job, she responded that she did not think she could complete the dissertation by May 2020, but that completion in the summer would be "more viable." ECF No. 43-1 at 78-81.

those "similarly situated") more greatly, but that her request was "impossible" to grant.[6] *Id.* at 23.  It is not clear, though, whether Defendant Silverstein understood Plaintiff's struggles to be anything more than what a great many across the country were experiencing as a result of COVID precautions.

Around this same time, Plaintiff emailed YLS Dean Heather Gerken to express concern that the pandemic was slowing down to the job market to an alarming degree, such that there was little prospect of employment at Yale or elsewhere.  She points out in that email that the J.S.D. program only provides funding for two years, as opposed to the five years' funding offered by Ph.D. programs (which programs she had been "willing to turn down" in favor of staying at Yale).  *Id.* at 33–34. She asked whether YLS had considered "any possible options to help" J.S.D. students but was referred back to Defendant Silverstein.  *Id.* at 33.

In December 2020 Plaintiff asked to be permitted to return to "in residence" status the following spring.  This is allowed by the relevant governing policies, provided the student can pay tuition and otherwise support themselves.  Plaintiff intended to take out loans to satisfy this requirement.  Professor Yaffe and Defendant Silverstein cautioned her against indebting herself for the sake of being on a campus that, due to the pandemic, was largely abandoned,[7] but they still supported her request.  Defendants assert that they were worried for Plaintiff's health and hoped that immersion in the campus, even such as it was at that point, would improve her condition and spur her to complete her thesis.

---

[6] Defendant Silverstein did several times express willingness to keep in closer touch with Plaintiff, and he suggested meeting classmates outside. He even offered to seek school funds to help her remove herself to someplace where she can be with people safely, but she declined that offer.  ECF No. 43-2 at 21-24.

[7] Defendant Silverstein even suggested that Plaintiff take "in residence" status just to confirm that there is no benefit to being on campus while COVID restrictions were in place, and then revert to non-resident status in time to get a full refund of her tuition.  ECF No. 42-2 at 57.

They strongly encouraged Plaintiff to have a complete draft by the end of the spring semester, though, and they informed her that a complete draft would be a prerequisite for any extension to her candidacy.  Professor Yaffe apparently believed that the requirement would not be onerous, as Plaintiff already had three chapters of the dissertation in draft or near-draft form.  ECF No. 43-1 at 93.  But Plaintiff objected to the condition, stating that it was a "harsher than normal standard" and noting that other J.S.D. candidates had extended their time in the program with no such prerequisite.  She found the condition inappropriate when circumstances (both global conditions and her own personal situation) called for a relaxation of standards.  ECF No. 43-2 at 51.

The court finds that this is the point at which Professor Yaffe and Defendant Silverstein learned that Plaintiff had health issues beyond the situational disorders brought on by the pandemic.  In January 2021, they exchanged emails in which they discussed that Plaintiff had disclosed she was at least unwell.  ECF No, 43-1 at 92-93.  Though it is unclear that they understood her to be disabled at this time, the court finds this to be the point at which they ought to have been aware that Yale might have had legal obligations to accommodate Plaintiff under the ADA and Section 504.  However, it does not appear that any action thus far is predicate conduct for any of Plaintiff's claims.

Plaintiff did not have a complete draft by the end of the Spring 2021 semester. Nevertheless, Professor Yaffe and Defendant Silverstein extended her candidacy through the 2021-2022 academic year, pursuant to the relevant policy.  In email correspondence between the two, Defendant Silverstein noted that Plaintiff appeared to be "in a dark place," and postulated that it would be "humane" to grant her an extension so that "if/when she is withdrawn from the program she might be better equipped to handle that."  ECF

No. 43-2 at 64.  Professor Yaffe agreed, expressing his willingness to give her more time "to find an alternative path for herself."  *Id.* at 63.  Apparently to that end, they granted Plaintiff a year-long extension.  Professor Yaffe was clear with her, though, that he would not support another extension, as he believed her to be no more than a few months away from completing her dissertation.  *Id.* at 62.

As noted supra, the court finds that by this point, Defendant Silverstein (and Yale University, through him) ought to have been alert to the possibility of legal obligations to Plaintiff.  And the court notes that Plaintiff did contact SAS in January 2021, though it appears that she did not make any formal complaint or request at that time.  ECF No. 43-3 at 16.  Given that there appeared to be no follow-up on her contact with SAS, and that Plaintiff did in fact receive the desired extension, the court finds this period to be relevant to Plaintiff's claims only insofar as it is the earliest that a factfinder reasonably could find that Defendants had knowledge of Plaintiff's disability.

Professor Yaffe suffered a severe health crisis in the summer of 2021 and was forced to take a leave of absence, which prevented him from continuing as Plaintiff's faculty advisor.  She was granted an extension to the 2022-2023 academic year given the unexpected development, and apparently pursuant to relevant policy, which provides that where a faculty advisor is unable or unwilling to continue in that capacity, the advisee will have two terms to secure a new faculty advisor.

The court notes that this extension was granted piecemeal: first Plaintiff was given through the fall of 2022, and then through the spring of 2023.  While the first of these extensions appears to have been purely administrative, there was communication between SAS and Plaintiff in September 2022, when Plaintiff informed SAS that her ability

to continue in the J.S.D. program was "in great jeopardy as a result of my disabilities and denial of reasonable accommodation requests to my program director," Defendant Silverstein. ECF No. 43-3 at 19. Defendant Silverstein, for his part, emailed Plaintiff later that month to tell her that he had decided to "administratively extend" her enrollment through the following Spring semester. ECF No. 43-2 at 68. In that email, he professed being "quite willing to work with Yale's SAS program should they propose an alternative." *Id.* Thus, the court finds that at this point, Plaintiff apparently had made a formal request for an accommodation and was granted that accommodation.

In Spring 2023, though, Plaintiff still did not have a complete draft of her thesis. In April of that year, Defendant Silverstein sent Plaintiff a reminder that she was required to submit an academic progress report by the end of that month. In response, Plaintiff asked to meet, which they apparently did, multiple times. Email correspondence indicates that Defendant Silverstein expressed concern that Plaintiff still did not have a faculty advisor, and he asked when she thought she would be able to secure one. Plaintiff responded,

> If I'm inside a burning building, I'm not in a good position to give the fire department an estimated real estate valuation for that building for the 4th quarter prior to them putting the fire out. What I can say is that it's a terrible investment while it's on fire, and that, having been on fire, it needs some investment to be marketable, that it will be worth nothing in the 4th quarter if the fire isn't put out, and as long as I'm presently in a burning building I won[']t be psychologically well positioned to work through the variables involved in real estate markets.

ECF No. 43-2 at 70. The court gathers that Plaintiff was aware that her lack of progress on her dissertation would cause potential faculty advisors to hesitate to take on the role, but also that she felt unable to timely improve her dissertation, let alone to seek a faculty advisor. She proposed to have secured a faculty advisor by May 2024.

Around the same time, Plaintiff again contacted SAS to request accommodations, including: (1) extending her dissertation deadline and her candidacy by three years, (2) relief from the progress report requirement for the 2022-2023 academic year, (3) a closed carrel in the library for the summer of 2023 and the following academic year, and (4) that the Graduate Program describe the period of Spring 2020 to Fall 2022 as a period during which Plaintiff was on medical leave.[8]  ECF No. 43-3 at 36.  The Director of SAS, Defendant McKeown, discussed these requests with Defendant Silverstein.

On May 9, 2023, Defendant Silverstein sent Plaintiff an email stating that (1) she would be excused from submitting a progress report for the 2022-2023 academic year; (2) her candidacy would be extended through the 2023-2024 academic year; (3) her progress report for the 2023-2024 year would not be waived and it would be due no later than April 15, 2024; (4) she would be permitted to represent that she had been "effectively" on leave from March 2020 through September 2021, though her formal status for that period could not be changed; and (5) any additional extensions of her candidacy would be considered only if she secured a faculty advisor and chair for her dissertation committee by April 15, 2024.  ECF No. 43-2 at 78–79.  The request for a dedicated carrel in the library was not feasible at that time.  *Id.*  Defendant Silverstein did leave open the possibility of another extension through Spring 2025, though.  *Id.*

Thus, at this point, it appears that Plaintiff made a formal request for a reasonable accommodation, and was granted a reasonable accommodation, though not as generous as she might have liked.  It is not clear whether this partial grant of her request is a predicate of any of her claims.

---

[8] Plaintiff expressed concern about explaining her extended stay in the program, and thought this would help her create and maintain working relationships with faculty.

On April 16, 2024 (one day after the deadline imposed a year prior), Plaintiff formally requested from SAS an accommodation in the form of an extension of the deadline that had passed the day before.  Defendant McKeown denied that request, stating only that Plaintiff had known about the deadline for a year and that the report was not a burdensome requirement.  ECF No. 43-2 at 89.  Plaintiff appealed that denial, but in an email sent April 22, 2024, Defendant Silverstein, separate from Plaintiff's formal appeal, extended the deadline for her progress report and for a confirmed faculty advisor to May 1, 2024.  ECF No. 43-2 at 93.  He was clear, though, that failure to satisfy both requirements would result in her being "withdrawn from the program."  *Id.*  Plaintiff apparently managed to interest another professor in supervising her the very next day, but the same day, that professor withdrew his offer, having spoken with Defendant Silverstein and "loath[ing] to be drawn into this."  ECF No. 24 ¶ 29.

Defendant Silverstein subsequently extended both deadlines further.  As Professor Yaffe was due to return to Yale soon, he gave Plaintiff until June 14 to confirm with Professor Yaffe that he would resume his role as her faculty advisor and chair of her dissertation committee.  Her progress report would be due May 3.  *Id.* at 98.

On June 11, 2024, Defendant Silverstein followed up with Plaintiff to inform her that Professor Yaffe had agreed to resume his formal role, though with another faculty member as co-chair of her dissertation committee and co-advisor.  ECF No. 43-2 at 103.  He also informed her, though, that any extension of her candidacy to the Spring 2025 semester would come with additional benchmarks, apparently by agreement of Professor Yaffe.  *Id.*  Specifically, a draft of her dissertation was due by January 6, 2025, and a final version, properly formatted, would be due by April 1, 2025.  *Id.*  If she failed to adhere to

these deadlines, she would be removed from the program. *Id.* Plaintiff agreed, though reluctantly, responding,

> Given that it is obviously impossible to arrange for any alternative advisor between the time you sent your email, and prior to the the [sic] June 14 deadline you set, and since I face the threat of expulsion and irreperable [sic] reputational damage that would permanently alter the course of my life and foreclose the professional and personal goals that are of the greatest importance to me, I have no meaningful choice in the matter. I am placed in a position where I would agree to anything under such a threat. If you say "and you must donate a kidney", [sic] then I would donate a kidney, since I can live with one kidney but I can't live the kind of life I want if I'm expelled from the [J.S.D. program.]

ECF No. 43-2 at 100. She further stated that she found this "quasi-probationary" status to be discriminatory, and that "it would be unreasonable to refuse to revisit deadlines," should events outside her control prevent her from progressing in her thesis. *Id.* She also made certain requests, including measures to keep her academic advisors uninvolved with her ongoing disputes with the administration; leave to bypass Defendant Silverstein in resolving those disputes and report to other administrators instead; that Defendant Silverstein not make any communication with anyone that might even conceivably further damage Plaintiff's reputation with the faculty; and

> 24/7 access to some suitable workspace where [Plaintiff] can A. Leave a monitor[;] B. use an ergonomic chair [which Plaintiff offered to supply;] C. leave some small amount of books and folders D. walk to another location in the same building to take breaks or shift from actively writing to reading and note-taking, such as the graduate student lounge D. not live in fear of being stalked, scrutinized and/or harassed by [a YLS employee], his subalterns and/or his replacement.

*Id.* at 102. She then suggested that this request could be satisfied by "merely" restoring to her certain rights that other J.S.D. students enjoy, but which apparently were taken from her in a "capricious, selectively enforced, fiat decision making . . . ." *Id.* The court

supposes this to be a reference to some issues Plaintiff had with custodial staff when she remained in the YLS building after closing, sometimes overnight, which led to YLS excluding her from the building. ECF No. 43-4 at 55.

It is not clear how Defendant Silverstein responded to these requests.

In December 2024, Plaintiff was struggling to meet her deadlines. Personal events had exacerbated her conditions, making it difficult to work on her thesis. She discussed her difficulties with Defendant Silverstein and indicated that she might require an additional year to complete her degree. He expressed disinclination to grant her any extension, though, and Plaintiff informed him that she found his treatment of her to be discriminatory, and she would be filing a complaint against him.

Plaintiff still managed to meet the January 6 deadline, even while drafting a complaint to the OIEA about Defendant Silverstein's handling of her situation, which she submitted in February.

In March, she submitted an urgent 16-page memo to SAS seeking formal accommodations in the form of (1) an extension of her candidacy through the 2025-2026 academic year, (2) that her final submission be due no earlier than May 1 of 2026, and (3) that no other requirements be imposed upon her than those laid out in the relevant program policies. ECF No. 30-4. Defendant McKeown testified that she talked with Plaintiff for approximately one hour and collected additional information before denying the request a few days later. She explained that Plaintiff already had received multiple extensions to complete the program, and that her faculty advisor did not support the request. ECF No. 30-5. There was no explanation of whether or how the requested accommodations would present either an undue burden to YLS or a fundamental

alteration to the program, even after Plaintiff explicitly asked for such an explanation.  ECF No. 30-6.

Plaintiff appealed that decision to OIEA, referencing two J.S.D. students who were not disabled but had been in the program even longer than she had.  On April 1, 2025, the Deputy ADA and Section 504 Coordinator communicated to SAS and Plaintiff his recommendation that SAS reconsider the first two of Plaintiff's requests.  ECF No. 30-3 at 2-3.  OIEA noted that SAS did not have a quantity of relevant information at the time its decision issued (including an updated note from Plaintiff's medical treatment provider).

Defendant McKeown asserts that in response to the OIEA recommendation, she reengaged in the interactive process by reviewing and revisiting the information that she had not considered when she first denied the request.  Plaintiff contends there was no meaningful interactive process, presumably based in the fact that Defendant McKeown did not speak with Plaintiff again.  Defendant McKeown testified that it was not necessary to speak with Plaintiff again, as they had just spoken the prior week.

In the course of her reconsideration of Plaintiff's request, Defendant McKeown learned that Plaintiff's dissertation had been accepted as final, and so on April 4, she emailed Plaintiff to inform her that the request had been denied again upon reconsideration, noting that Plaintiff's dissertation was complete, and that she had no faculty advisor.[9]  ECF No. 30-22.  In response to a specific question from Plaintiff,

---

[9] In an email from Professor Yaffe to Plaintiff dated March 19, 2025, he states that he would not support a petition to extend her candidacy to the 2025-2026 academic year.  He was clear in that email that he understood Plaintiff's reasons for another extension to be (1) because Plaintiff thought she would have better luck applying for other programs and positions if she maintained an affiliation with a university, and (2) because Plaintiff feared being isolated without her connection to Yale.  Professor Yaffe did not think that the lack of a university affiliation would affect her desirability as an applicant, and he also did not think that continued association with Yale was the answer to her fear of isolation.  ECF No. 43-1 at 113.  He also stated that Plaintiff had "completed all the academic work for the [J.S.D.]"  *Id.* at 110.

Defendant McKeown stated that proceeding without a faculty advisor and continuing in the program having already submitted a complete and satisfactory dissertation, would be a fundamental alteration to the program.[10]  ECF No. 30-23 at 1-2.  Oddly, it appears that the formal report of OIEA's recommendation to reconsider, though dated April 1, was not sent to Plaintiff until April 14.  ECF No. 30-23 at 3.  Defendant McKeown testified that she confirmed with OIEA that it was satisfied with her reconsideration.

Of note, Defendants contend that the two individuals Plaintiff identified as having been in the program longer than she has, are not similarly situated.  Those two individuals work and/or study in other academic programs overseas.  Plaintiff made the compelling point at oral argument, though, that this explanation merely raises the question of why Defendants felt that other educational or professional pursuits (which are not protected by law) are worthy of accommodation, but a disability (which is protected by law) is not.

Plaintiff believes that her dissertation is incomplete.  Only one of five chapters is in publishable condition, two are in draft form, and one has not even been started.  But Professor Yaffe and the other academics who have reviewed the paper describe it in extremely favorable terms.  Professor Yaffe said that it was well above the quality necessary for the degree.  Moreover, current program policy allows a student to continue to make minor revisions to a dissertation for six months after it is submitted, which would allow more than enough time for formatting.  Further, it appears that Plaintiff herself anticipated the draft she submitted in January 2025 to be at least close to final, as she asked Professor Yaffe "to indicate receipt/completion of the [J.S.D.] thesis" within letters of recommendation in support of applications she submitted at the start of year.

---

[10] Defense counsel stated at the hearing that Yale was not arguing the requested accommodations would be an undue burden.

With no means of forestalling the conferral of her degree (or her expulsion, as Plaintiff characterized it, ECF No. 50-2 at 5), which would formally discharge her from the program, Plaintiff filed this suit.

This is the complete context in which the court determines whether to convert the temporary restraining order to a preliminary injunction.

## A. Likelihood of Success

To show a likelihood of success, Plaintiff need not prove that she is certain to prevail in this action, but she must make a clear showing that she is likely to succeed on her claims. *Donohue v. Paterson*, 715 F. Supp. 2d 306, 314 (N.D.N.Y. 2010). At the time the temporary restraining order issued, Plaintiff had presented those facts that best supported her claims, such that it then appeared to the court that she clearly had satisfied this element.

Now, though, with the benefit of the additional context provided by Defendants, the court finds that the question of Plaintiff's success on the merits is much closer, and indeed too close to be characterized as "likely."

### i. *Retaliation Claims*

With respect to her retaliation claims, from the point that the court deems Defendants to have known of her disability (late 2020 and early 2021), Plaintiff certainly engaged in protected activity by seeking accommodations and by submitting internal complaints and appeals. However, it is unclear that she suffered any adverse action, or even which specific actions she contends were retaliatory. Plaintiff points to the imposition of increasingly onerous deadlines and requirements; interfering with her attempt to secure a faculty advisor; providing false and misleading information to the

OIEA during her appeal; and refusing to engage in a meaningful interactive process after being directed to do so by OIEA.    But it is not clear what specific deadlines she found to be onerous, or what false information Defendants supplied to OIEA.

As to the former, by the end of the Spring 2023 semester, Plaintiff's deadlines had been extended or waived, and the only deadlines imposed by such time were those contemplated in the relevant program policy: a progress report would be due a year later, and she would have to secure a faculty advisor by the same time.  The progress report is a clear requirement of the program, and it is undisputed that J.S.D. students would have two terms to secure a new advisor should they need one.  It appears that Plaintiff received twice as long as that to engage a new faculty advisor.  And then even those deadlines were extended, multiple times.  The court also cannot conclude that a jury likely would find the subsequent imposition of deadlines for her final thesis to constitute an adverse action.  It is not clear why those deadlines were unreasonable, given Professor Yaffe's speculation that she only had a few months' work left to do on them.  And it is not clear that such deadlines are prohibited by the program policy.

As to the allegedly false information given to OIEA, the court presumes that Plaintiff refers to the disagreement she has with YLS as to the completeness of her dissertation.  But it appears factually true that her thesis had been accepted as complete and satisfactory at the time of Plaintiff's appeal.  Whether it was in a state that ought to have been deemed complete and satisfactory is another matter, and one which the court cannot resolve here.  It will be for a factfinder to determine whether the dissertation was of a quality to be accepted, or whether the acceptance was an end-run around Defendants' legal obligations to Plaintiff (either potentially supported by the record facts).

Furthermore, the court cannot conclude that Defendant Silverstein's alleged interference with Plaintiff's courtship of a new faculty advisor was an adverse action where (1) the details of this allegation are incredibly sparse, and (2) it is undisputed that Defendant Silverstein extended the deadline to secure a new advisor, in order to allow Plaintiff to continue with Professor Yaffe.

Finally, the court cannot conclude at this point in litigation that Defendants' interactive process failed to satisfy statutory requirements as a matter of law.  In the first instance, scope is important to this question.  Plaintiff would like the court to focus only upon the period of reconsideration, or perhaps the latter part of the Spring 2025 semester.  But looking back from 2021, when Defendants apparently knew of their obligations to Plaintiff, they met many times with her, discussed over email ways they might assist her, and made quantifiable allowances for her situation.   Even looking just to the period Plaintiff highlights, though, it is clear that over the course of a few weeks (the short timeline being necessary to respond to Plaintiff's request for urgency) Defendant McKeown met with Plaintiff, spoke with all relevant parties at YLS, reviewed documentation, reviewed more documentation, and communicated with OIEA about its process.  Of course, this is not proof positive of satisfactory engagement with the statutes and the Plaintiff, but it certainly is persuasive.  And given that Plaintiff was not ordered to testify at the hearing, though Defendants called her to testify, the court is without her perspective on why she found the process perfunctory.

Accordingly, having reviewed the complete record, the court cannot conclude that Plaintiff is likely to succeed on her retaliation claims such that she satisfies the first element of the relevant test.

ii. ***Failure to Accommodate***

Turning next to her claims that Defendants failed to accommodate Plaintiff, the court closely examines whether Plaintiff convincingly has shown that she was denied the opportunity to participate in the J.S.D. program by reason of her disability.  Plaintiff asserts that Defendants' failures include imposing arbitrary deadlines and requirements not applied to similarly situated students without disabilities; failing to modify academic requirements which have a discriminatory effect on the basis of disability; and applying standards and criteria which have the effect of discriminating on the basis of disability.

Here, again, though, it is not clear which standards and criteria Defendants ought to have modified, and which they ought not to have applied.  The record facts establish that Defendants continued and completely marked off many more deadlines than they imposed, and it is not at all clear that any imposed deadlines were arbitrary.  It also seems inconsistent with the fundamental nature of an educational program to wholly prohibit its faculty and administrators from imposing interim deadlines upon its students, particularly upon those students who have had difficulty meeting program expectations.  Indeed, a factfinder may well look at the complete record and conclude that Defendants have accommodated Plaintiff for several years.  And while, of course, past accommodations are not preclusive to later violations, they certainly are relevant to the inquiry.

Given the additional factual allegations now in the record, the court finds Plaintiff's chances of carrying her claims for failure to accommodate to be far too low to satisfy the standard required for imposition of a preliminary injunction.

The court makes clear that it does not find that Plaintiff's claims to lack viability.  To the contrary, Plaintiff may well carry some (or all) of her claims.  There are ample facts

in the record from which a factfinder might conclude that Defendants did violate their obligations under the ADA and Section 504. Plaintiff made the strong point at the hearing that having been granted an accommodation by way of an extension into the 2024-2025 academic year, and having experienced additional setbacks during that period, it may have been reasonable for Plaintiff to expect that Defendants would proportionally extend her candidacy. And one reasonably might question why Defendants find additional educational and professional obligations worthy of extensions greater than even Plaintiff has been granted but feel differently about personal health obligations. A jury also reasonably might take issue with email correspondence between Defendant Silverstein and Defendant Yaffe which clearly shows they understand Plaintiff is not well, but wherein they appear more concerned with her inability to perform as the typical candidate does, and determine that they are being generous in allowing her additional time before terminating her from the program, rather than considering how they might work with her to address her symptoms.

To be sure, this ruling is far from a summary judgment on the merits of Plaintiff's claims. It is simply a finding that the questions of fact are too close to justify injunctive remedies at this point in litigation.

### B. <u>Irreparable Harm</u>

Similarly, while it is clear that Plaintiff has alleged a redressable injury, Defendants' arguments and additional factual allegations give the court some measure of doubt as to whether the potential harm to Plaintiff truly would be irreparable, or even likely, even after the concerns most recently raised by Plaintiff.

First, Plaintiff asserts that being graduated from the J.S.D. program prematurely would be detrimental to her professional prospects because she would have a substandard dissertation.  Setting aside the question of whether her dissertation in fact is substandard, Defendants contest the notion that the dissertation is of great import in the academic job market.  There was testimony at the hearing from several professors that it was more important to show consistent work product, and that Plaintiff's lengthy candidacy was likely to be more detrimental to her prospects than any deficiency in the thesis.  But more persuasive on this point is the already-extensive documentary record in this case, which shows that Plaintiff has been pursuing academic positions (including tenure-track positions) for years, even without a dissertation, and more importantly, that she appears to have been a competitive candidate.  And perhaps most persuasive of all are the several points in the record where multiple actors reference how unfavorable the academic job market has been in recent years.  Thus, it is not clear that any difficulty Plaintiff may have in securing a new situation is attributable to Defendants' actions.

In a similar vein, Plaintiff argues that she will be deprived of Yale resources if she is not granted a preliminary injunction.  The court finds this argument unpersuasive for a few reasons.  First, it is clear now that (1) she does not have courses in which to enroll, and (2) as a non-resident student, the resources to which she has access are limited.  Furthermore, at the hearing, Plaintiff clarified that she only sought extension of her candidacy to the end of the 2025-2026 academic year.  However, she already received such relief without a court order for four years on end, and by her account, those extensions have been insufficient to afford Plaintiff the full benefits of the J.S.D. program.  She does not explain why she has been unable to make best use of Yale resources in

the prior four years, but still believes she will be able to do so in the coming year.  Thus, the court is not convinced that this specific harm is one which would be prevented by issuance of a preliminary injunction.

Next, Plaintiff asserts that violations of civil rights statutes give rise to a presumption of irreparable harm.  In the first instance, the case upon which Plaintiff primarily relies, *Hernandez v. Enfield Bd. of Educ.,* No. 3:19-CV-1907 (SRU), 2024 WL 3011177, at *3 (D. Conn. June 14, 2024),[11] dealt with a permanent injunction issued after a jury already had returned a verdict.  Thus, there, the violation already was established.  Here, as discussed supra, the fact of a violation is far from established, and so any presumption has been rebutted.

Finally, Plaintiff argues that denying her a preliminary injunction will exacerbate her medical conditions.  This is not a case where a litigant would be denied treatment necessary to stave off great derogation of one's health, as it appears Plaintiff still has access to her treatment providers.  Nor would Plaintiff likely be subjected to conditions particularly antagonistic to her preexisting condition.  Plaintiff's filings make clear that the stress, frustration, and disappointment of recent months (or even years) have caused her some measure of suffering, and that this lawsuit itself, although she herself initiated it, would cause her still more suffering.  Given Plaintiff's apparent ill health, the court cannot quantify any additional harm which could follow denied injunctive relief.  Moreover, Plaintiff's counsel orally argued that he expects Plaintiff to recover from the stress and suffering she is currently experiencing.  Thus, even this harm clearly is not irreparable.

---

[11] Plaintiff's reliance upon *Du v. DHS*, 3:25-cv-644 (D. Conn. April 28, 2025), also is misplaced.  There, international students lawfully studying in the United States had their legal documentation unilaterally deleted by the government, exposing them to the threat of detention by law enforcement and deportation. The difference between that situation and the present one warrants no additional discussion.

## C.  Balance of Hardships/Public Interest

This is the only element of the relevant standard that the court still finds to be satisfied.  Defendants themselves stated at the hearing that it did not intend to argue any undue burden, which the court finds relevant to the question of relative hardships.  Especially since Plaintiff now is a non-resident student, it appears the only hardship to Defendants would be the continued strain on their human resources, and most particularly those of Plaintiff's faculty advisor.  This, compared to the potential harm to Plaintiff, which includes (by her allegation) inability to find work, and the loss of her human and financial resources that she has invested in a highly desirable educational pursuit absent realization of advertised benefits from the same.  And the court still is unpersuaded that the public has an interest in speedy resolution of these claims.  To the contrary, the court finds that the public interest is better served in careful resolution of these claims, which arguably is best accomplished by maintenance of the case's current posture.


## IV.     CONCLUSION

Accordingly, it is thereupon **ORDERED AND ADJUDGED** that Plaintiff's motion for a preliminary injunction is **DENIED**.   The temporary restraining order hereby is **DISSOLVED**.

**IT IS SO ORDERED** at Hartford, Connecticut, this 23rd day of June, 2025.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE